**UNITED STATES of America**

v.

**Fawaz YUNIS.**

**Crim. A. No. 87–0377.**

United States District Court, District of Columbia.

Feb. 12, 1988.

**898**

J. Ramsey Johnson, Karen A. Morrissette, Jennifer Gold, Asst. U.S. Attys., Washington, D.C., for plaintiff.

Francis D. Carter, Turner and Carter, Washington, D.C., for defendant.

## PRETRIAL MEMORANDUM ORDER NO. 4

(Denying Defendant's Motion to Dismiss the Indictment and the Defendant for Lack of Jurisdiction)

BARRINGTON D. PARKER, District Judge.

Defendant's motion to dismiss, presenting interesting and novel legal issues, challenges the authority for and the limits to which the United States government may extend its prosecutorial arm over certain crimes allegedly committed by a nonresident alien on foreign soil.

In the original multi-count indictment of September 15, 1987, the United States charged Fawaz Yunis, a resident and citizen of Lebanon, for his alleged involvement in the hijacking of a Jordanian civilian aircraft in the Middle East. Specifically, Count I—charged defendant with conspiracy to commit hostage taking against passengers and crew, to damage, destroy, disable and place destructive devices aboard an aircraft, and to perform acts of violence against passengers and crew in violation of 18 U.S.C. §§ 371, 1203, 32(a)(1), (2) and (5); Count II—seizing, detaining and threatening passengers and crew members, including three American nationals as hostages, in violation of 18 U.S.C. §§ 1203; Counts III, IV and V—damaging, destroying, disabling and placing a destructive device upon an aircraft operating in foreign air commerce and committing acts of violence against aircraft personnel in violation of 18 U.S.C. §§ 32(a)(1), (2) and (5). After Yunis was apprehended in international waters of the Mediterranean Sea and brought to the United States, a superseding indictment was filed on October 1, 1987 adding four additional counts—Counts VI, VII, VIII and IX. Those counts charged Yunis with damaging, destroying and placing a destructive device on an aircraft registered in a foreign country and harming aircraft personnel, in violation of 18 U.S.C. §§ 32(b)(1), (2) and (3) and 49 U.S.C.App. § 1472(n)(1).

Defendant's counsel has moved to dismiss the indictment on grounds that this Court lacks subject matter jurisdiction under general principles of international law and the stated provisions of the United States Code. The motion is predicated on grounds that the Jordanian aircraft never flew over United States airspace and had no contact whatsoever with United States territory. Without such connection, Yunis' counsel argues that this Court has no basis for asserting either subject matter or personal jurisdiction. In analyzing whether physical contact with the United States is necessary to proceed with the indictment, the Court first reviews the events surrounding the hijacking. The Court also examines various principles of international law to determine whether they afford grounds for exercising jurisdiction over defendant. Lastly, two relevant statutes, the Hostage Taking Act, 18 U.S.C. § 1203, and the several discrete provisions invoked under the Destruction of Aircraft Act, 18 U.S.C. §§ 32(a) and (b) [also referred to as The Aircraft Piracy Act] are examined to determine whether they apply to offenses committed overseas.[1]

After careful review of the pleadings, relevant case law, treatises, and oral argument of counsel, the Court concludes that consistent with reputable and generally accepted treatises and international law prin-

---

1. Section 32(a) covers offenses committed on aircraft having some physical nexus to the United States, either operating in "the special aircraft jurisdiction" or in "overseas or foreign air commerce." Section 32(b) authorizes jurisdiction over offenses committed entirely in foreign airspace if the "offender is later found" in the United States. Both sections are examined in detail *infra* pp. 905–09.

ciples, there are sufficient grounds for asserting both subject matter and personal jurisdiction. Further, the Hostage Taking Act and Section 32(b) of the Aircraft Piracy Act impose liability for offenses allegedly committed by defendant. However, for the reasons explained more fully below, the Court concludes that Section 32(a) of the Aircraft Piracy Act does not apply. The alleged offenses thereunder have no connection whatsoever to United States territory.

## I.

## BACKGROUND

This criminal proceeding and indictment arise from the hijacking of a Jordanian civil aircraft, Royal Jordanian Airlines ("ALIA") Flight 402, on June 11, and 12, 1985. There is no dispute that the only nexus to the United States was the presence of several American nationals on board the flight. The airplane was registered in Jordan, flew the Jordanian flag and never landed on American soil or flew over American airspace.

On the morning of June 11, the aircraft was positioned at the Beirut International Airport, Beirut, Lebanon, for a scheduled departure to Amman, Jordan. As the 50–60 passengers boarded, several Arab men, one allegedly the defendant, stormed the plane and ordered the pilot to fly to Tunis, Tunisia where a meeting of the Arab League Conference was underway. The airplane departed from Beirut with all passengers, including the Americans, held hostage. The plane made a short landing in Larnaco, Cyprus where additional fuel was obtained. It then proceeded to Tunis where landing privileges were denied. The airplane flew to Palermo, Sicily, where it was allowed to replenish its fuel and food supply. Thereafter, it lifted off, destined once more for Tunis. Again, entry was denied and the pilot returned to Beirut. On the morning of June 12th, it took off for Damascus, Syria. However, the Syrian authorities also denied landing privileges. Thus after crisscrossing the Mediterranean Sea area for more than 30 hours, the hijackers were forced to return to Beirut, their point of initial departure.

After landing, the hostages were directed to exit the aircraft. The hijackers then called an impromptu press conference and the defendant Yunis allegedly read a speech, which he originally intended to give to the delegates of the Arab League Conference then meeting in Tunis. Following the speech, the hijackers blew up the Jordanian aircraft, quickly left the scene and vanished into the Beirut landscape.

Between June 11 and 12, 1985, ALIA flight 402 never landed on or flew over American space. Its flightpath was limited to an area within and around the Mediterranean Sea. Based on the absence of any nexus to United States territory, Yunis has moved to dismiss the entire indictment, arguing that no United States federal court has jurisdiction to prosecute a foreign national for crimes committed in foreign airspace and on foreign soil. He further claims that the presence of the American nationals on board the aircraft is an insufficient basis for exercising jurisdiction under principles of international law.

Defendant's motion raises several threshold inquiries: whether or not there is a basis for jurisdiction under international law, and if so, whether Congress intended to and had authority to extend jurisdiction of our federal courts over criminal offenses and events which were committed and occurred overseas and out of the territorial jurisdiction of such courts.

## II.

## ANALYSIS

### A. JURISDICTION UNDER INTERNATIONAL LAW

The parties agree that there are five traditional bases of jurisdiction over extraterritorial crimes under international law:

*Territorial,* wherein jurisdiction is based on the place where the offense is committed;

*National,* wherein jurisdiction is based on the nationality of the offender;

*Protective,* wherein jurisdiction is based on whether the national interest is injured;

*Universal,* wherein jurisdiction is conferred in any forum that obtains physical custody of the perpetuator of certain offenses considered particularly heinous and harmful to humanity.

*Passive personal,* wherein jurisdiction is based on the nationality of the victim. These general principles were developed in 1935 by a Harvard Research Project in an effort to codify principles of jurisdiction under international law. *See Harvard Research in International Law, Jurisdiction with Respect to Crime,* 29 Am.J.Int'l L. 435, 445 (Supp.1935). Most courts, including our Court of Appeals, have adopted the Harvard Research designations on jurisdiction. *See, e.g., Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 781, n. 7 (D.C.Cir. 1984) *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *Chua Han Mow. v. United States,* 730 F.2d 1308, 1311 (9th Cir.1984) *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985); *Rivard v. United States,* 375 F.2d 882, 885 (5th Cir.) *cert. denied,* 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967). Several reputable treatises have also recognized the principles: L. Henkin, International Law Cases and Materials 447 (1980); A. D'Amato, International Law and World Order 564 (1980).

The Universal and the Passive Personal principle appear to offer potential bases for asserting jurisdiction over the hostage-taking and aircraft piracy charges against Yunis. However, his counsel argues that the Universal principle is not applicable because neither hostage-taking nor aircraft piracy are heinous crimes encompassed by the doctrine. He urges further, that the United States does not recognize Passive Personal as a legitimate source of jurisdiction. The government flatly disagrees and maintains that jurisdiction is appropriate under both.

### 1. *Universal Principle*

██ The Universal principle recognizes that certain offenses are so heinous and so widely condemned that "any state if it captures the offender may prosecute and punish that person on behalf of the world community regardless of the nationality of the offender or victim or where the crime was committed." M. Bassiouini, II International Criminal Law, Ch. 6 at 298 (ed. 1986). The crucial question for purposes of defendant's motion is how crimes are classified as "heinous" and whether aircraft piracy and hostage taking fit into this category.

Those crimes that are condemned by the world community and subject to prosecution under the Universal principal are often a matter of international conventions or treaties. *See Demjanjuk v. Petrovsky,* 776 F.2d 571, 582 (6th Cir.1985) (Treaty against genocide signed by a significant number of states made that crime heinous; therefore, Israel had proper jurisdiction over nazi war criminal under the Universal principle).

Both offenses are the subject of international agreements. A majority of states in the world community including Lebanon, have signed three treaties condemning aircraft piracy: The Tokyo Convention[2], The Hague Convention,[3] and The Montreal Convention.[4] The Hague and Montreal Conventions explicitly rely on the principle of Universal jurisdiction in mandating that all states "take such measures as may be necessary to establish its jurisdiction over the offences ... where the alleged offender is present in its territory." Hague Convention Art. 4 § 2; Montreal Convention Art. 5 § 2. Further, those treaties direct that all "contracting states ... of which the alleged offender is found, ... shall, be

---

**2.** Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963 T.I.A.S. No. 159.

**3.** Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, T.I.A.S. No. 7192.

**4.** Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Sept. 23, 1971. T.I.A.S. No. 7570.

obliged, *without exception whatsoever and whether or not the offense was committed in its territory,* to submit the case to its competent authorities for the purpose of prosecution." Hague Convention Art. 7; Montreal Convention Art. 7. (emphasis added) These two provisions together demonstrate the international community's strong commitment to punish aircraft hijackers irrespective of where the hijacking occurred.

The global community has also joined together and adopted the International Convention for the Taking of Hostages[5] an agreement which condemns and criminalizes the offense of hostage taking. Like the conventions denouncing aircraft piracy, this treaty requires signatory states to prosecute any alleged offenders "present in its territory."[6]

In light of the global efforts to punish aircraft piracy and hostage taking, international legal scholars unanimously agree that these crimes fit within the category of heinous crimes for purposes of asserting universal jurisdiction. *See* M. Bassiouini, II International Criminal Law Ch. 2 at 31–32; McCredie, *Contemporary Uses of Force Against Terrorism,* 1986 Ga.J. of Int'l & Comp.L. 435, 439 (1986); Bazyler, *Capturing the Terrorist in the Wild Blue Yonder,* 8 Whittier L.Rev. 685, 687 (1986); Blakesley, *United States Jurisdiction over Extraterritorial Crime,* 73 J. of Crim.L. & Criminology 1109, 1140 (1982). In The Restatement (Revised) of Foreign Relations Law of the United States, a source heavily relied upon by the defendant, aircraft hijacking is specifically identified as a universal crime over which all states should exercise jurisdiction.[7]

Our Circuit has cited the Restatement with approval and determined that the Universal principle, standing alone, provides sufficient basis for asserting jurisdiction over an alleged offender. *See Tel–Oren v. Libyan Arab Republic,* 726 F.2d at 781, n. 7, ("The premise of universal jurisdiction is that a state 'may exercise jurisdiction to define and punish certain offenses recognized by the community of nations as of universal concern,' ... even where no other recognized basis of jurisdiction is present.") Therefore, under recognized principles of international law, and the law of this Circuit, there is clear authority to assert jurisdiction over Yunis for the offenses of aircraft piracy and hostage taking.

### 2. *Passive Personal Principle*

This principle authorizes states to assert jurisdiction over offenses committed against their citizens abroad. It recognizes that each state has a legitimate interest in protecting the safety of its citizens when they journey outside national boundaries. Because American nationals were on board the Jordanian aircraft, the government contends that the Court may exercise jurisdiction over Yunis under this principle. Defendant argues that this theory of jurisdiction is neither recognized by the international community nor the United States and is an insufficient basis for sustaining jurisdiction over Yunis.

Although many international legal scholars agree that the principle is the most controversial of the five sources of jurisdiction, they also agree that the international community recognizes its legitimacy. Most accept that "the extraterritorial reach of a law premised upon the ... principle would not be in doubt as a matter of international law." Paust, *Jurisdiction and Nonimmunity,* 23 Va.J. of Int'l Law, 191, 203 (1983). More importantly, the international community explicitly approved of the principle as

---

**5.** 34 U.N. GAOR Supp. (No. 39) at 23, UN. Doc. A/34/39 (1979), reprinted in 18 I.L.M. 1456 (1979) [hereinafter Hostage Taking Convention].

**6.** Art. V. § 2 states "each state *shall* establish jurisdiction in cases where the alleged offender is present in its territory."

**7.** Part IV § 404 (Tent.Draft No. 6, 1985) of the Restatement, entitled "Universal Jurisdiction to

Define and Punish Selected Offenses," provides that "a state may exercise jurisdiction to define and punish certain offenses recognized by the community of nations as of national concern, such as piracy, slave trade, *attacks on or hijacking of aircraft,* genocide, war crimes, and perhaps terrorism, even where none of the bases of jurisdiction indicated in § 402 is present." (emphasis added).

a basis for asserting jurisdiction over hostage takers. As noted above, *supra* p. 9, the Hostage Taking Convention set forth certain mandatory sources of jurisdiction. But it also gave each signatory country discretion to exercise extraterritorial jurisdiction when the offense was committed "with respect to a hostage who is a national of that state if that state considers it appropriate." Art. 5(a)(d). Therefore, even if there are doubts regarding the international community's acceptance, there can be no doubt concerning the application of this principle to the offense of hostage taking, an offense for which Yunis is charged. *See* M. Bassiouni, II International Criminal Law ch. 4 at 120.

 Defendant's counsel correctly notes that the Passive Personal principle traditionally has been an anathema to United States lawmakers.[8] But his reliance on the Restatement (Revised) of Foreign Relations Laws for the claim that the United States can never invoke the principle is misplaced.[9] In the past, the United States has protested any assertion of such jurisdiction for fear that it could lead to indefinite criminal liability for its own citizens. This objection was based on the belief that foreigners visiting the United States should comply with our laws and should not be permitted to carry their laws with them.

Otherwise Americans would face criminal prosecutions for actions unknown to them as illegal.[10] However, in the most recent draft of the Restatement, the authors noted that the theory "has been increasingly accepted when applied to terrorist and other organized attacks on a state's nationals by reason of their nationality, or to assassinations of a state's ambassadors, or government officials." Restatement (Revised) § 402, comment g (Tent.Draft No. 6). *See also* McGinley, *The Achillo Lauro Affair–Implications for International Law,* 52 Tenn.L.Rev. 691, 713 (1985). The authors retreated from their wholesale rejection of the principle, recognizing that perpetrators of crimes unanimously condemned by members of the international community, should be aware of the illegality of their actions.[11] Therefore, qualified application of the doctrine to serious and universally condemned crimes will not raise the specter of unlimited and unexpected criminal liability.

Finally, this case does not present the first time that the United States has invoked the principle to assert jurisdiction over a hijacker who seized an American hostage on foreign soil.[12] The government relied on this very principle when it sought extradition of Muhammed Abbas Zaiden, the leader of the terrorists who hijacked

---

8. However, defendant improperly relies on *United States v. Layton,* 509 F.Supp. 212, 215 (N.D.Cal.1981) for the proposition that the United States categorically rejects this principle. In that case, involving the murder of American citizens in Jonestown Guyana, the Court merely noted historic opposition to the theory. It explicitly declined to address the legitimacy of the principle finding that jurisdiction was permissible on the basis of three other principles.

9. The Restatement provides that "A State does not have jurisdiction to prescribe a rule of law attaching a legal consequence to conduct of an alien outside its territory merely on the ground that the conduct affects one of its nationals." Restatement (Revised) of Foreign Relations Law § 402.

10. The case most widely cited for the United States' rejection of the passive personality principle is known as the *Cutting* case, 1887 For.Rel. 751 (1888, reported in 2 J.B. Moore International Law Digest 232–40 (1906). In that case, the Secretary of State protested the Mexican author-

ity's assertion of jurisdiction over an American national seized while traveling in Mexico. The American was prosecuted for writing an article in a Texas newspaper criticizing a Mexican national. The Mexican authorities indicted him for criminal libel.

11. While it might be too much to expect the average citizen to be familiar with all of the criminal laws of every country, it is not unrealistic to assume that he would realize that committing a terrorist act might subject him to foreign prosecution. See Note, Bringing the Terrorist to Justice, 11 Cornell Int'l L.J. 71 (1978).

12. At least one Court has explicitly relied on the passive personality principle to assert jurisdiction over foreigners committing crimes against U.S. nationals overseas. *United States v. Benitez,* 741 F.2d 1312, 1316 (11th Cir.1984) (Columbian charged with conspiracy to murder DEA agent). ("The nationality of the victims, who are United States government agents, clearly supports jurisdiction.")

the Achillo Lauro vessel in Egyptian waters and subsequently killed Leon Klinghoffer, an American citizen. As here, the only connection to the United States was Klinghoffer's American citizenship. Based on that link, an arrest warrant was issued charging Abbas with hostage taking, conspiracy and piracy. *Id.* at 719; *See also* N.Y. Times, Oct. 16, 1985 § 1 at 1 col. 6.[13]

Thus the Universal and Passive Personality principles, together, provide ample grounds for this Court to assert jurisdiction over Yunis. In fact, reliance on both strengthens the basis for asserting jurisdiction. Not only is the United States acting on behalf of the world community to punish alleged offenders of crimes that threaten the very foundations of world order, but the United States has its own interest in protecting its nationals.[14]

### B. JURISDICTION UNDER DOMESTIC LAW

Even if there is authority to assert jurisdiction over Yunis under International law, defendant's counsel argues that the Court has no jurisdiction under domestic law. He contends that Congress neither had the power nor the intention to authorize jurisdiction over the offenses of hostage taking and aircraft piracy committed "half way around the world".

But defendant's argument fails to recognize the power of the Congress to legislate overseas and to define and punish offenses committed on foreign soil. Article I section 8, Clause 11 of the Constitution gives Congress the power to "define and punish Piracies and Felonies committed on the High Seas and Offenses against the Law of Nations." As explained, *supra*, in the discussion on the Universal principle, both hostage taking and aircraft piracy have been defined as offenses against the law of nations.

The reliance that Yunis' counsel places on *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922) to argue that Congress has no power to extend jurisdiction outside its territorial boundaries, is misplaced. *Bowman* stands for the contrary proposition. Indeed, it is routinely quoted for the holding that "there is no constitutional bar to the extraterritorial application of penal laws." *United States v. King*, 552 F.2d 833, 850 (9th Cir.1976).

A more accurate interpretation of *Bowman* and its progeny is that Congress has the power to punish crimes committed overseas but it must evince such an intent with clarity. "If punishment ... is extended to include those [acts] committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute and failure to do so will negate the purpose of Congress in this regard." *Bowman* 260 U.S. at 98, 43 S.Ct. at 41.

The two statutes under which the defendant was indicted, the Hostage Taking Act and the Aircraft Piracy Act, were part

---

**13.** Only recently, the Justice Department announced it had withdrawn the arrest warrant issued against Abbas after reviewing the outstanding indictment and weighing the fact that the defendant had been convicted and sentenced in absentia in an Italian Court. *See* Wash. Post, Jan. 17, 1988.

**14.** The government also argues that a third doctrine, the Protective principle, offers grounds for asserting jurisdiction over Yunis. Because this principle gives states wide latitude in defining the parameters of their jurisdiction, the international community has strictly construed the reach of this doctrine to those offenses posing a direct, specific threat to national security. *See* Blakesley, United States Jurisdiction over extraterritorial Crime, 73 J.Crim.L. & Criminology at 1136; Bassiouini, II International Criminal Law ch. 2 at 21. Recently, some academicians have urged a more liberal interpretation of the protective principle when applied to terroristic activities. Given "the increase in the number of terroristic threats against United States nationals abroad, there can be no doubt that the United States has significant security and protective interests at stake." Paust, Federal Jurisdiction over Extraterritorial Acts of Terrorism, 23 Va.J. of Int'l Law 191, 210 (1983).

In this case, the hijackers never made any demands upon the United States government nor directly threatened its security. Indeed, it was almost happenstance that three American nationals were on board the aircraft. Given the regional focus of the hijacking, a court would have to adopt an expansive view of the principle to assert jurisdiction over Yunis. Since jurisdiction is available under the universality and passive personality principle, there is no reason to reach out and rely on the protective principle as well.

of a three bill package enacted by Congress in 1984 aimed at combating the rise of terrorism.[15] Both were promulgated to extend jurisdiction over extraterritorial crimes and satisfy the country's obligations as a party to various international conventions. *See* V. Nanda & M. Bassiouni, International Criminal Law, a Guide to U.S. Practice and Procedure, 17, 29, (1987). Because of the newness of the statutes, no court has been called upon to analyze the scope of the jurisdictional provisions. Therefore, the Court must rely on the recognized tools of statutory interpretation, the language of the statute along with the statutory history, to evaluate whether these provisions apply to the particular offenses charged in this indictment.

### 1. *Hostage Taking Act, 18 U.S.C. 1203*

■ This statute imposes liability on any individual who takes an American national hostage irrespective of where the seizure occurs. Congress wrote the jurisdictional reach of the statute in clear and unambiguous language. Subsection (b)(1) provides that a defendant is properly chargeable for offenses occurring outside the United States if *any one* of the following circumstances exists:

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

In the face of this unambiguous language, defendant nevertheless draws on the legislative history to argue that Congress did not intend to extend jurisdiction merely on the grounds that American nationals were seized. However, such reliance is misplaced. Our Circuit has stated time and again that "it is elementary in the law of statutory construction that, absent ambiguity or unreasonable result, the literal language of the statute controls and resort to legislative history is not only unnecessary but improper." *Eagle Picher Industries Inc. v. E.P.A.*, 759 F.2d 922, 929, n. 11 (D.C.Cir.1985) (quoting *Montgomery Charter Service Inc. v. Washington Metropolitan Area Transit Commission*, 325 F.2d 230, 233 (D.C.Cir.1963)).

Moreover, Yunis' counsel misrepresents the legislative history by selectively excerpting quotations to support the claim that Congress never intended to authorize jurisdiction for offenses committed on foreign soil. By excerpting quotations out of context, he merely obfuscates the plain language of the statute and the intent of Congress. Indeed, read in full, the statutory history supports the government's position, demonstrating that Congress intended to provide broad jurisdiction over these offenses. For instance, defendant relies on a statement made by Victoria Toensing, Deputy Assistant Attorney General, to argue that if offenses occur overseas, the government in which it occurs is responsible for dealing with the incident. (Defendant's Consolidated Reply at 6 and 11.) Toensing did indeed testify that "we anticipate and believe that the foreign government law enforcement authorities will be chiefly responsible for those hostage-taking situations occurring within their jurisdiction." However, in her very next sentence she stated: "If, however, the perpetrator evades the jurisdiction of the foreign court, *or the court fails to mete out justice in vindication of our interests, we would have subject matter jurisdiction over the offense.* Of course we could not proceed to trial unless we obtain personal jurisdiction over the perpetrator." (emphasis added)[16]

---

**15.** The third is the Act to Combat International Terrorism, 18 U.S.C. § 3071 (1984) (authorizing the Attorney General to reward individuals who furnish information regarding certain terrorist acts.)

**16.** Legislative Initiatives to Curb Domestic and International Terrorism: Hearings on S. 2470, S. 2624, S. 2625, S. 2626 Before the Subcommittee on Security and Terrorism of Senate Judic.Comm., 98th Cong. 2nd Sess. 128 (1984) (Testimony of Victoria Toensing, Deputy Assistant Attorney General). [hereinafter cited as Legislative Initiative hearings]

Moreover, the very purpose behind the Hostage Taking Statute was to "demonstrate to other governments and international forums that the United States is serious about its efforts to deal with international terrorism." [17] Ms. Toensing explicitly stated in her testimony that "[t]he bill provides broad jurisdiction over the hostage taking offense. It is predicated on recognized extraterritorial principles of international law to provide for punishment of any United States national who takes hostages anywhere in the world, as well as any perpetrator who takes a United States national hostage *anywhere* in the world." Legislative Initiative Hearings at 48–49. (emphasis added).

Congress enacted the Hostage Taking Act to meet its obligations as a signatory state to the Hostage Taking Convention, *supra*, fns. 5 & 6. Article 5 of that treaty required signatory states to extend jurisdiction over hijacking committed outside the United States when the offender was a citizen of the states, or "present" in the state. It also provided states with the discretion to assert jurisdiction when their nationals were taken hostage. Congress' voluntary decision to adopt this permissive basis of jurisdiction underscores its intent to exercise broad jurisdiction over any offender who threatens American nationals.[18] Therefore, the plain language of the statute coupled with its legislative history and purpose clearly support a finding that Congress intended to assert extraterritorial jurisdiction over offenders such as Yunis who allegedly seized Americans hostage in foreign territory.

### 2. *Destruction of Aircraft Act, 18 U.S. C. 32*

This statute imposes liability for willfully destroying an aircraft, assaulting passengers and crew on board an airflight, damaging an aircraft and placing a destructive device in the aircraft. 18 U.S.C. 32. Two subsections are included 32(a) and 32(b). Subsection (a) applies to offenses committed against "any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce." Subsection (b) applies to acts of violence against any individual on board "any civil aircraft registered in a country other than the United States.... if the offender is later found in the United States."

The subsections provide alternative bases for exercising jurisdiction. The operative provision of 32(a) is the location of the aircraft; the operative provision of 32(b) is the subsequent location of the offender. Together, the two impose a wide circle of liability. Defendant has been charged under each section. The Court will first discuss the application of 32(b) and then turn to the application of 32(a).

(a.) *Application of 32(b)*: jurisdiction over offenders later "found" in the United States.

■ This provision expressly extends jurisdiction over an alleged saboteur who commits offenses against an aircraft located in foreign airspace and has no other nexus to the United States other than that he or she "is later found in the United States." 18 U.S.C. 32(b)(4). Defendant was charged with violating these provisions, in the superceding indictment of October 1, 1987 that was filed after Yunis was arrested and flown to this country aboard a naval plane.

Defendant's counsel argues that his client was not "found" in the United States within the meaning of the statute. He purports that the word "found" only pertains to individuals who voluntarily entered the United States and were later discovered by the government; the term was never

---

**17.** President's Message to Congress on the International Convention Against the Taking of Hostages, 20 Weekly Comp.Pres.Doc. 590, 592 (April 26, 1984).

**18.** See also, Handbook on the Comprehensive Crime Control Act of 1984, 200 (1984) ("Con-

gress chose to provide such protection for Americans by utilizing the permissive authority of the convention and the passive personality basis for extraterritorial jurisdiction under International law.")

envisioned to apply to defendants forcibly abducted and brought to the United States. Yunis did not voluntarily enter the country. To the contrary, he was lured through efforts and stratagem of FBI agents to international waters off the coast of Cyprus, where he was arrested and forcibly brought to the United States. Therefore, counsel argues that the government's forcible kidnapping of Yunis obviates any jurisdiction under this statute. In response, the government states that the term "found" is neither defined in the statute nor explained in the legislative history. Indeed, the statute neither precludes nor approves the extension of jurisdiction over offenders who have been brought to this country by force. However, the government urges that the legislative history and purpose behind the statute support asserting jurisdiction over the defendant.[19]

█ Defendant's attempt to limit the Court's jurisdiction is unavailing. Once a defendant is brought within the jurisdiction of the Court he is subject to prosecution for all federal offenses. Yunis was seized for alleged violation of the hostage taking statute. Physical presence in United States territory is not a necessary element for exercising subject matter jurisdiction over that offense. Only after he stepped onto American soil was the defendant charged with aircraft piracy. Indeed, once he was within the boundaries of the United States, the government was obligated by statute and the Montreal Convention to prosecute him for destroying the aircraft. As discussed earlier, both the Hague Convention and the Montreal Convention require all contracting states to exercise jurisdiction over individuals charged with seizing control of an aircraft. Any state that secures custody of the alleged hijackers is obligated to prosecute or extradite them.[20]

Moreover, the purpose behind the Aircraft Piracy Act supports extending jurisdiction over the defendant. The legislative history indicates that Congress intended to exercise broad jurisdiction over offenses of aircraft piracy. The Senate Report, accompanying the Act, stated that the legislation would show the world community that the country was serious "in [its] efforts to combat international terrorism." S.Rep. No. 619, 98th Cong. 2nd Sess. at 2. While testifying before the Committee, Ms. Toensing in stressing the importance of interpreting broadly the jurisdictional provisions stated in part:

> A key provision of the Aircraft Sabotage Act gives the U.S. criminal courts jurisdiction over persons sabotaging aircraft, even if a U.S. aircraft was not involved and the act was not within this country.... What we do by signing this implementing legislation is tell the international community that the United States has taken a stand against terrorism.

Legislative Initiative Hearings at 42–43. This passage demonstrates that the United States intended to "make every effort to investigate, apprehend and prosecute terrorists as criminals."[21] However, the decision to permit the government to bring charges against the defendant under this statute should not be regarded as giving the government carte blanche to act as a global police force seizing and abducting terrorists anywhere in the world. The government cannot act beyond the jurisdictional parameters set forth by principles of international law and domestic statute.[22]

---

19. The language of the Act is unelucidating. Neither the three relevant international conventions relating to aircraft hijacking or the U.S. Code provision define or explain the meaning of "found". The term is the passive tense of "find" which is defined in Webster's Third New International Dictionary as requiring an affirmative act: "to come upon (a material object by searching or effort). The government's efforts to seize the defendant overseas and forcible abduction to this country is not inconsistent with this definition.

20. See, Blakesley, Jurisdiction as Legal Protection against Terrorism, 19 Conn.L.Rev. 895, 918, (1987).

21. Vice President's Task Force, Public Report of the Vice President's Task Force on Combatting Terrorism, 9 (Feb. 1986).

22. In this proceeding, the government had ample authority to secure the arrest of defendant under the Universal Passive Personality principle together with the Hijack Taking statute.

Furthermore, the Court notes that in this case, Lebanon, a signatory state to the Montreal Convention seemed incapable or unwilling to bring charges against Yunis and enforce its obligations under the convention. When another government harbors international terrorists or is unable to enforce international law, it is left to the world community to respond and prosecute the alleged terrorists. As long as governments which step into this enforcement role act within the constraints imposed by international and domestic law, their efforts to combat terrorism should be praised. *See,* C. Findlay, Abducting Terrorists Overseas for Trial in the United States: Issues of International and Domestic Law, 23 Tex.Int'l L.J. 1 (1988).

 (b.) *Application of 32(a):* jurisdiction over aircraft in "overseas or foreign air commerce".

■ This provision imposes liability on individuals who damage and destroy an aircraft and/or perform acts of violence against passengers on board a civil aircraft that operates in "overseas or foreign air commerce." 18 U.S.C. § 32(a). Yunis has been charged specifically in Count I with conspiracy to hijack and destroy an aircraft; Count III with destroying a civil aircraft; Count IV with placing a destructive device on a civil aircraft; and in Count V with performing acts of violence against passengers of a civil aircraft.[23]

> Jurisdiction was only appropriate under 32(b) *after* the defendant entered the country. The Court refrains from deciding whether jurisdiction would exist if the defendant were forcibly brought to the United States and charged solely with violating 18 U.S.C. § 32(b).

**23.** Defendant originally argued that every violation of 32(a) must involve an aircraft "in the special aircraft jurisdiction of the United States." That term required that the plane either originate or terminate in the United States. Since the ALIA flight never passed over any United States facilities, he contended that these statutory provisions were inapplicable. However, counsel withdrew this argument in his Omnibus Reply. He conceded that the statute was not qualified by the term special aircraft jurisdiction" but was explicitly disjunctive creating an offense for committing acts against: any aircraft in the special aircraft jurisdiction of the

■ The 32(a) provision does not become operative unless the aircraft flies in "overseas or foreign air commerce." Defendant contends that the terms "overseas air commerce" and "foreign air commerce" require some nexus to the United States. Because the ALIA flight never landed on or even flew over American air space, he urges the Court to dismiss these counts. In turn, the government argues that Congress intended to regulate air commerce broadly and impose liability against alleged perpetrators of aircraft piracy irregardless of where the offense took place or which country operated the aircraft.[24]

The Court agrees that Counts III, IV, and V must be dismissed. Section (a) of this provision is applicable only to aircraft operating in "interstate, overseas or foreign air commerce." The definitional provision of the Act, 18 U.S.C. § 31, relies on the "meaning ascribed to those terms in the Federal Aviation Act of 1958, as amended." That statute provides:

> "interstate air commerce, overseas air commerce, and foreign air commerce respectively, mean the carriage by aircraft of persons ...... or the operation or navigation of aircraft in the conduct or furtherance of a business or vocation, in commerce between, respectively,—
>
> (a) a place in any State of the United States ... through the airspace over any place outside thereof; or between places in the same Territory or possession of the United States,

United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce.

**24.** Rather than relying on Congress's direct authority under Art. I Section 8 to define and punish offenses against the law of nations, the government contends that Congress has authority to regulate global air commerce under the commerce clause. U.S. Const. art. I, § 8, c. 3. The government's arguments based on the commerce clause are unpersuasive. Certainly Congress has plenary power to regulate the flow of commerce within the boundaries of United States territory. But it is not empowered to regulate foreign commerce which has no connection to the United States. Unlike the states, foreign nations have never submitted to the sovereignty of the United States government nor ceded their regulatory powers to the United States.

(b) a place in any State of the United States and any place in a Territory or possession of the United States; and (c) a place in the United States and any place outside thereof whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation."

49 U.S.C. § 1301(23).

■ Although Congress could have expanded the jurisdictional net of subsection 32(a) [25] by adopting a new, more expansive definition of "foreign air commerce," it deliberately chose to rely upon the definition of those terms already incorporated in the Federal Aviation Act. The government simply ignores a deliberate decision of Congress and urges a definition of foreign or overseas air commerce which directly contravenes the plain meaning and prevailing interpretation of these terms as defined in the Federal Aviation Act.[26] The government's definition focuses on the cumulative travels of a passenger or piece of cargo rather than the flightpath of the particular aircraft. If the passenger or package *ever* landed or departed from American territory then the government urges that any flight taken by such passenger would be considered in "foreign air commerce." Because the American nationals must have departed from the United States some time in the past, the government asserts that any flight they boarded in the future, including ALIA flight 402, would be considered in the stream of "foreign air commerce" for purposes of liability under 18 U.S.C. § 32(a).

By focusing solely on the passengers and their connection to United States soil no matter how remote, the government's definition makes almost every aircraft subject to regulation by the United States. Airline companies operating exclusively overseas which wanted to avoid such regulation would be forced to research the travel history of every potential passenger and then exclude any person who had every traveled to the United States.

When exposed to its core, the government's extreme interpretation is rejected. Neither the courts nor the United States Department of Transportation ("DOT"), the agency in charge of administering the Act,[27] have ever adopted the government's broad, open-ended definition. Indeed, the agency has expressly rejected the mirror image of the interpretation urged by the government here. In *Competitive Marketing Case*, 92 C.A.B. 1287 (1981), the agency refused to define "foreign air commerce" under a "flow of commerce test":

Under a flow of commerce test, foreign air transportation would include all segments of a journey with foreign originations or destinations. Thus, the intent of the passenger would be controlling and, so long as his itinerary included a foreign point, his entire journey would be in foreign air transportation, no matter how

**25.** Indeed, Congress amended the Aircraft Piracy Act in 1984 to include § (b) precisely because § (a) did not confer jurisdiction over individuals who committed crimes against aircraft registered outside the United States which did operate in any United States' territory. In the Senate Report, the Committee recognized that "normally the United States would lack jurisdiction to bring such individuals to trial." S.Rep. 619 at 5. Therefore, it amended the Act to include § (b) which extended jurisdiction over offenses having no relation to the United States on the condition that the perpetrator was *later found* in the United States. It reserved application of § (a) to offenses committed against aircraft having *some* physical or operational connection to the United States.

**26.** The government obliquely suggests in a footnote that jurisdiction could be obtained under the statute's definition of "air commerce". 49 U.S.C. § 1301(4) That provision defines "air commerce" to include the "operation of any aircraft which directly affects or which may endanger safety in interstate, overseas or foreign air commerce." However, because the statute has a specific, discrete definition for "foreign air commerce", it is clear that Congress did not intend the two to be interchangeable. Section 32 does not include the term "air commerce" as one of the preconditions for application of § (a). Therefore the definition of "air commerce" is irrelevant to the jurisdictional reach of § 32.

**27.** The Civil Aeronautics Board ("CAB") originally administered this Act. However, when the CAB ceased to exist, the DOT assumed its administrative responsibilities. See Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98–443, § 12(e), 98 Stat. 1703, 1711 (1984).

many airlines flown, how many or how long the breaks in his journey, or how the passenger is ticketed. *IATA's assertion that our precedent uniformly adopts such a rule is mistaken. Moreover, an examination of those precedents reveals that, had we adopted a flow of commerce test, it would have let to absurd results* (emphasis added).

Similarly, in an earlier case, the CAB refused to define aircraft which carried cargo and passengers between two points within the United States as operating in "foreign air commerce" merely because some of its passengers were destined for points outside the United States. *Quantas Empire,* 29 CAB 33 (1959); *accord, Colonial Air et al. Atlantic Seaboard Operation,* 4 CAB 633, 634 (1944). The government suggests that an aircraft operating exclusively between two points overseas flies in "foreign air commerce" because some of its cargo may at some point in time have originated from or be destined for the United States. This interpretation of "foreign air commerce" is simply the flip side of that expressly rejected in *Competitive Marketing Quantas* and *Colonial Air.*

The case authority also repudiates the government's position. "The Federal Aviation Act does not apply to the activities of a foreign carrier operating between two foreign points without contact in the United States." *Cheng v. Boeing Co.,* 708 F.2d 1406, 1412 (9th Cir.1983). The more reasonable interpretation of the term adopted by the agency and this Circuit is to look at the particular flight and determine "whether there was a significant break in the journey" between its connection to the United States and points elsewhere. *Japan Air Lines v. Dole,* 801 F.2d 483, 487 (D.C.Cir.1986). Here, the ALIA flight had no connection whatsoever with United States territory. Further, the government has not offered a single shred of evidence demonstrating that any of the American passengers were using the ALIA flight as a connector either from or back to this country. In fact, it has failed to offer any evidence showing when the nationals last departed from the States. It could have been years ago. Therefore, the Court must conclude that the ALIA Flight 402 was not in foreign or overseas air commerce for purposes of 18 U.S.C. § 32(a).

Based on the above, Counts III, IV and V of the indictment must be dismissed. Dismissal of those Counts also requires dismissal of the corresponding sections of Count I; ¶ 4b, c, & d, charging the defendant with violations under 18 U.S.C. § 32(a). However, the remaining section of the conspiracy count, ¶ 4a, charging defendant with violations under 18 U.S.C. §§ 1203 and 2 shall stand.

█ Defendant's request that all evidence obtained during the course of the arrest should be suppressed, is unwarranted and denied. The government had authority to secure Yunis' arrest under the Hostage Taking Act. Since the government had a clear statutory basis for arresting the defendant, there is no reason to apply the exclusionary rule and suppress any fruits of the lawful arrest.

Accordingly, on the basis of the above, it is this 12th day of February, 1988,

## ORDERED

That defendant's Motion to Dismiss the Indictment and to Dismiss the Defendant from the Jurisdiction of the Court is granted as to that portion of Count I as stated above and Counts III, IV, and V charging defendant with violation of 18 U.S.C. § 32(a). The Motion to Dismiss as to the remainder of Count I and Counts II, VI, VII, VIII, and IX, is denied.