IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40351
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LLANELY SANTOS-RIVIERA,

Defendant- Appellant.


_____

Appeal from the United States District Court for
the Southern District of Texas
_____

July 29, 1999

Before REAVLEY, JOLLY and EMILIO M. GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

Llanely Santos-Riviera, an illegal alien, was charged under the Hostage Taking Act, 18 U.S.C. § 1203, and convicted by jury of one count of seizing, detaining, and threatening to injure a ten month old infant in order to compel the infant's parents to pay a cash ransom for her release. The kidnapping occurred within the United States and the victim is a United States citizen. This appeal raises two issues: (1) whether the government was required to allege in the indictment and prove at trial, as essential elements of the offense, that the appellant was a foreign national and that the hostage taking or kidnapping at issue had some other "international aspect;" and (2)

whether the Hostage Taking Act, as applied to Santos-Riviera, violated her Equal Protection

rights because the statute discriminates on the basis of alienage. We answer both questions in the

negative and affirm.

## I. BACKGROUND

The grand jury indictment charged that Santos-Riviera, within the Southern District of

Texas, "did knowingly and intentionally seize, detain, threaten to injure and continue to detain

Jocelyn Tehya Garrido in order to compel Ricardo Garrido and Maria Elliott Garrido to pay a

cash ransom for the release of Jocelyn Tehya Garrido," in violation of 18 U.S.C. §§ 2 and 1203.

The indictment did not allege that Santos-Riviera was an illegal alien or that the kidnapping

involved the United States government or some other international aspect.

The evidence at trial showed that in 1997, Santos-Riviera illegally entered the United

States from her home in Oaxaca, Mexico. In July of that year, she obtained employment in

Brownsville, Texas caring for the two youngest children of Mr. and Mrs. Ricardo Garrido, Jr.

While caring for the children, Santos-Riviera, either acting alone or aiding and abetting another

person,[1] abducted the Garrido's ten month old daughter and wrote a ransom note demanding that

the Garridos pay $7000 for their daughter's return. Santos-Riviera initially told the Garridos and

law enforcement officers that she had been sexually assaulted by three men who then kidnapped

the child. After additional investigation and questioning, during which officers pointed out several

---

[1] The defense theory below was that a man known only as Antonio coerced appellant into participating in the abduction. The jury, however, clearly rejected the coercion defense by finding Santos-Riviera guilty. The jury necessarily either entirely rejected Santos-Riviera's testimony concerning Antonio's participation in the abduction and determined that she acted alone, or the jury determined that Santos-Riviera knowingly and willingly aided and abetted Antonio in the commission of the offense.

2

inconsistencies in appellant's version of the events, Santos-Riviera confessed that she had fabricated the story about the three men and purported that a man named Antonio had forced her to participate in the abduction. A search for a man fitting the description of Antonio given by appellant was unsuccessful. Within a few hours of the abduction, the child was found alive in a wooded area behind the house where the Garridos were living. Santos-Riviera testified at trial that Antonio threatened her and forced her to give him the child, told her what to write in the ransom note, and told her to tell the Garridos that three men had raped her and taken the child. Appellant's trial testimony, however, was inconsistent in several respects with her prior statements to the investigating officers, including her prior written statement that Antonio had offered her $2000 to participate in the abduction and promised to change her identity and move her to another city. The jury returned a verdict of guilty, and the district court sentenced Santos-Riviera to 144 months of imprisonment and five years of supervised release.

## II. ANALYSIS

### A. SUFFICIENCY OF THE INDICTMENT

Santos-Riviera contends that the indictment was defective because it failed to allege that she was a non-national and that the kidnapping involved an additional "international aspect." Although styled as a sufficiency claim, appellant actually poses a statutory construction question requiring us to determine the essential elements of an offense under the Hostage Taking Act, *i.e.*, whether the indictment must negate the exceptions set forth in § 1203(b)(2) to allege that the offender or victim is a non-national and whether the indictment must also allege an additional "international aspect."

3

We analyze questions of statutory interpretation *de novo*. *See United States v. Fitch*, 137 F.3d 277, 281 (5th Cir. 1998). Likewise, whether an indictment sufficiently alleges the elements of an offense is a question of law, which we review *de novo*. *See United States v. Cabrera-Teran*, 168 F.3d 141, 143 (5th Cir. 1999). "The Sixth Amendment requires that an indictment (1) enumerate each *prima facie* element of the charged offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecutions." *United States v. Gaytan*, 74 F.3d 545, 551 (5th Cir. 1996).

We begin our analysis with the essential elements of an offense under the Hostage Taking Act. The statute provides in relevant part:

> **(a)** *Except as provided in subsection (b)* of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

> **(b)(1)** It is *not an offense* under this section if the conduct required for the offense occurred outside the United States unless—

>> **(A)** the offender or the person seized or detained is a national of the United States;

>> **(B)** the offender is found in the United States; or

>> **(C)** the governmental organization sought to be compelled is the Government of the United States.

> **(2)** It is *not an offense* under this section if the conduct required for the offense occurred inside the United States, *each alleged offender and each person seized or detained are nationals* of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

4

18 U.S.C. § 1203 (emphasis added). At issue here is the construction and interplay of subsections (a) and (b).[2] Section 1203(a) delineates the prohibited conduct under the Act; it criminalizes the seizure or detention of a person in order to compel a third person or government organization to act or refrain from acting as a condition for release of the person detained. Section 1203(b) sets forth exceptions to the Act's coverage, depending on whether the offense occurred within or without the United States. If the kidnapping occurred within the United States, as was the case here, subsection (b)(2) provides that the statute does not apply if both the victim and the offender are nationals of the United States and the party to be compelled is not the United States government. *See* § 1203(b)(2). In other words, application of the Hostage Taking Act to a domestic kidnapping not involving the United States government turns on the citizenship status of the offender or victim.

Santos-Riviera contends that, in addition to the elements set forth in § 1203(a), the indictment should have further alleged that she was a non-national and that the kidnapping involved some "international aspect" or nexus beyond her status as an illegal alien. She essentially asserts that the government has the burden of negating the exceptions listed in § 1203(b). In support of her position, Santos-Riviera relies primarily upon language from our opinion in *United States v. Carrion-Caliz*, 944 F.2d 220 (5th Cir. 1991), wherein we stated that "the Hostage Taking Act applies *only* to acts of kidnapping or hostage taking which have some international aspect or involve the United States government." *Id.* at 224. By contrast, the Government argues that the exceptions listed in subsection (b) are not essential elements of the offense, but

---

[2] Section 1203(c) is not at issue in this appeal.

5

rather are affirmative defenses for which the defendant bears the burden of proof. We agree with the Government.

Santos-Riviera's reliance on *Carrion-Caliz* is misplaced. In that case, while addressing a sufficiency of the evidence challenge to a conviction under § 1203, we, for the first time, set forth the essential elements of the offense. *See id.* at 222-23. We quoted the text of § 1203(a) and held:

> by the plain terms of the statute, a conviction under the Hostage Taking Act requires the Government to show that the defendant 1) seized or detained another person, 2) threatened to kill, injure, or continue to detain that person, 3) with the purpose of compelling a third person or governmental entity to act in some way, or to refrain from acting in some way.

*Id.* at 223; *accord United States v. Lin*, 101 F.3d 760, 766 (D.C. Cir. 1996);*United States v. Lopez-Flores*, 63 F.3d 1468, 1476 (9th Cir. 1995).

We then compared the Hostage Taking Act to the analogous federal kidnapping statute, 18 U.S.C. § 1201, in order to interpret the words "seizes" and "detains" contained in § 1203(a). *See Carrion-Caliz*, 944 F.2d at 223-25. Addressing the concern that the two statutes should not be construed to be redundant, we distinguished the statutes by noting that the federal kidnapping statute made no reference to aliens and had "only limited extraterritorial application," *id.* at 224, whereas the Hostage Taking Act "was adopted specifically 'to extend jurisdiction over extraterritorial crimes and satisfy the country's obligations as a party to various international conventions.'" *Id.* (quoting *United States v. Yunis*, 681 F. Supp. 896, 904 (D.D.C. 1988)). We further noted that the Hostage Taking Act "'also provided [signatory] states with the discretion to assert jurisdiction when their nationals were taken hostage.'" *Id.* (quoting *Yunis*, 681 F. Supp. at 905). Our statement in that context that "the Hostage Taking Act applies *only* to acts of

6

kidnapping or hostage taking which have some international aspect or involve the United States government" was simply an acknowledgment of the scope of the statute's coverage and did not modify our previous express holding as to the essential elements of the offense. Moreover, as at least one other court has recognized, our use of the phrase "international aspect" was merely a shorthand reference to the exceptions listed in § 1203(b)(1) and (2). *See United States v. Pacheco*, 902 F. Supp. 469, 473 (S.D.N.Y. 1995) ("[I]t appears that the term 'international aspect' was merely a short hand [*sic*] means of summarizing the Act's requirement that the offender or the person seized or detained is not a national of the United States."). Thus, our holding today—that neither the citizenship status of the offender or victim nor any other international aspect is an essential element of an offense under § 1203 for which the government bears the burden of proof—is fully consistent with *Carrion-Caliz.*

Second, our interpretation of the Hostage Taking Act is consistent with the well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime. *See McKelvey v. United States*, 260 U.S. 353, 357, 43 S. Ct. 132, 134, 67 L. Ed. 301 (1922) ("By repeated decisions it has come to be a settled rule in this jurisdiction that an indictment or other pleading founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause . . . and that it is incumbent on one who relies on such an exception to set it up and establish it."); *accord United States v. Britton*, 107 U.S. 655, 670, 2 S. Ct. 512, 524-25, 27 L. Ed. 520 (1883); *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992) (following "[t]he well-established rule

7

. . . that a defendant who relies upon an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception" (internal quotation marks omitted)); *cf. United States v. Vuitch*, 402 U.S. 62, 70, 91 S. Ct. 1294, 1298, 28 L. Ed. 2d 601 (1971) ("It is a general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception.").

Applying the above principles, this court and other circuits have interpreted similarly structured criminal statutes consistent with our reading of the Hostage Taking Act. *See United States v. Gonzales*, 121 F.3d 928, 936-37 (5th Cir. 1997) (interpreting the federal machine gun statute,[3] 18 U.S.C. § 922(*o*), which in subsection (1) prohibits unlawful possession of a machine gun, but contains exceptions in subsection (2) for lawful possession prior to the statute's effective date, and holding that the subsection (2) exception is an affirmative defense), *cert. denied*, 118 S.

---

[3] By way of comparison to the Hostage Taking Act, we note that the federal machine gun statute is similarly structured and provides:

> (*o*)(**1**) *Except as provided in paragraph (2)*, it shall be unlawful for any person to transfer or possess a machinegun.
>
> (**2**) *This subsection does not apply with respect to*—
>
> > (**A**) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof . . . ; or
> >
> > (**B**) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o*) (emphasis added).

Ct. 726, *and cert. denied*, 118 S. Ct. 1084 (1998); *accord United States v. Just*, 74 F.3d 902, 904

(8th Cir. 1996); *see also United States v. Steele*, 147 F.3d 1316, 1318-20 (11th Cir. 1998)

(joining Third, Sixth, and Seventh Circuits in analogous interpretation of 21 U.S.C. § 841);

*Green*, 962 F.2d at 941 (rendering an analogous interpretation of 18 U.S.C. § 474).

Finally, we disagree with Santos-Riviera's assertion that our recent decision in *United States v. Adams*, 174 F.3d 571 (5th Cir. 1999), supports her reading of the Hostage Taking Act. In *Adams*, we construed 50 C.F.R. § 20.21(i),[4] which prohibits hunting certain birds over baited areas pursuant to the Migratory Bird Treaty Act, 16 U.S.C. § 703. In *Adams*, we rejected the

_____

[4] Section 20.21 provides in relevant part:

Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory game birds:

(a) . . . ;

\* \* \*

(i) By the aid of baiting, or on or over any baited area. . . . However, nothing in this paragraph shall prohibit:

(1) The taking of all migratory game birds, including waterfowl, on or over standing crops, flooded standing crops (including aquatics), flooded harvested croplands, grain crops properly shocked on the field where grown, or grains found scattered solely *as the result of normal agricultural planting or harvesting*; and

(2) The taking of all migratory game birds, except waterfowl, on or over any lands where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed has been distributed or scattered *as the result of bona fide agricultural operations or procedures* . . . ;

(j) . . . .

50 C.F.R. § 20.21 (emphasis added).

9

Government's argument that the two exceptions set forth in § 20.21(i)(1) and (2) for "normal agricultural planting or harvesting" and "bona fide agricultural operations or procedures" were affirmative defenses as opposed to elements of the crime itself. We held that "[t]he onus is therefore on the Government to prove that neither circumstance existed." *See* 174 F.3d at 578. While we did not expressly cite the rule of criminal statutory construction discussed above, an examination of the structure of § 20.21 reveals that, unlike the Hostage Taking Act, the prohibited conduct is set forth in continuous fashion in subsections (a) through (j). *See* § 20.21(a)–(j). The delineation of the prohibited conduct is not complete until the end of subsection (j). Moreover, the exceptions at issue in *Adams* are incorporated within subsection (i) and are not contained in separate, distinct clauses or provisos. Thus, *Adams* is distinguishable from the instant case and is congruous with the line of authorities noted above.

### B.  SUFFICIENCY OF THE EVIDENCE

Santos-Riviera makes a related claim that the evidence was insufficient to support her conviction because the Government failed to prove that her offense involved the United States government or had an international aspect *other than* her status as an illegal alien. She does not dispute that the evidence was sufficient to establish all of the elements set forth in § 1203(a) and to prove that she was not a national of the United States. Having held that the Government does not have the burden to negate the exception set forth in § 1203(b)(2) and that it is not an element of the offense that the kidnapping or hostage taking involve some additional international aspect or nexus, we naturally reject Santos-Riviera's sufficiency challenge.

### C.  EQUAL PROTECTION CLAIM

10

Santos-Riviera also raises a constitutional challenge to the Hostage Taking Act. She argues that, as applied, the Act violates her equal protection rights because it discriminates on the basis of alienage, *i.e.*, the statute provides for federal prosecution of a purely local kidnapping when the defendant is an alien, whereas a United States citizen or national would not be subject to federal prosecution and the corresponding harsher federal penalties for the same conduct. The constitutionality of the Hostage Taking Act is a matter of first impression in this Circuit. The Second and Ninth Circuits, however, have both considered the issue and held that the Act does not violate the equal protection component of the Fifth Amendment Due Process clause. *See United States v. Lue*, 134 F.3d 79, 87 (2d Cir. 1998); *United States v. Lopez-Flores*, 63 F.3d 1468, 1475 (9th Cir. 1995). We now join our sister circuits and reject appellant's equal protection claim.

We review the constitutionality of a federal statute *de novo*. *See United States v. Rasco*, 123 F.3d 222, 226 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 868 (1998). There is no dispute that § 1203(b)(2) discriminates against offenders based on alienage, *i.e.*, if the victim is a national and the United States government is not the party to be compelled, the statute criminalizes conduct by an alien that would not be subject to federal prosecution if undertaken by a United States citizen. We must determine, applying the appropriate level of scrutiny, whether this classification is justified.

We reject appellant's erroneous suggestion that both state and federal statutes that classify based on alienage are subject to strict scrutiny. Appellant's reliance on *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995), to support this position is misplaced, since *Adarand* concerned a race-based classification, which is always subject to strict

11

scrutiny regardless of whether the classification is found in a state or federal statute.  Such is not the case with classifications based on alienage.  *See Mathews v. Diaz*, 426 U.S. 67, 84-85, 96 S. Ct. 1883, 1893-94, 48 L. Ed. 2d 478 (1976) (distinguishing *Graham v. Richardson*, 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971), on the basis that "[t]he equal protection analysis . . . involves significantly different considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal Government.").

We apply the deferential rational basis test to federal statutes that classify based on alienage and will uphold the statute if it is rationally related to a legitimate government interest. *See Mathews*, 426 U.S. at 79-87, 96 S. Ct. at 1891-95 (recognizing that Congress has broad authority over immigration, naturalization, and foreign policy and applying narrow, deferential standard of review to uphold federal statute that conditions an alien's eligibility for Medicaid on satisfaction of a durational residency requirement); *Lue*, 134 F.3d at 87 ("As long as the Hostage Taking Act is *rationally related to a legitimate government interest* it satisfies principles of equal protection in this context." (emphasis added)); *Lopez-Flores*, 63 F.3d at 1475 ("Federal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration *or* foreign policy powers, is therefore subject to the lowest level of judicial review."); *id.* at 1473 (holding that judicial scrutiny of the federal Hostage Taking Act is "relaxed to a 'rational basis'").

The legislative history of the Hostage Taking Act demonstrates that the Act was passed to address legitimate foreign policy concerns.  Indeed, as we noted in *Carrion-Caliz*:

> Congress enacted the Hostage Taking Act to meet its obligations as a signatory state to the Hostage Taking Convention.  Article 5 of that treaty required signatory states to extend jurisdiction over hijacking committed outside the United States when the offender was a citizen of the states, or "present" in the state.  It also provided states with the discretion to assert jurisdiction when their nationals were

12

taken hostage. Congress' voluntary decision to adopt this permissive basis of jurisdiction underscores its intent to exercise broad jurisdiction over any offender who threatens American nationals.

*Carrion-Caliz*, 944 F.2d at 224 (quoting *Yunis*, 681 F.Supp. at 904); *see also Lue*, 134 F.3d at 81-82 (discussing legislative history of Hostage Taking Act); *Lopez-Flores*, 63 F.3d at 1472-73 (also discussing the Act's legislative history).

The crux of Santos-Riviera's argument is that, although there are legitimate governmental interests in extending jurisdiction over extraterritorial crimes, curtailing terrorism, and enforcing treaties, prosecuting a hostage taking case for a domestic kidnapping based solely on the perpetrator's alienage achieves none of these governmental interests. The Second Circuit considered and rejected this argument in *Lue*. The court explained:

> We recognize that in the Hostage Taking Act Congress employs the classification of alienage to proscribe conduct which may not always bear a direct relationship to the Act's principal object of stemming acts of terrorism, and that at some point a classification of this sort may have a "relationship to [the] asserted goal [which] is so attenuated as to render the distinction arbitrary or irrational." However, in this instance, Congress rationally concluded that a hostage taking within our jurisdiction involving a noncitizen is sufficiently likely to involve matters implicating foreign policy or immigration concerns as to warrant a federal criminal proscription. The connection between the act and its purpose is not so attenuated as to fail to meet the rational-basis standard.

134 F.3d at 87 (citations omitted). We adopt the reasoning and holding of *Lue*.

AFFIRMED.

13