**UNITED STATES of America, Appellee,**

v.

**Dennis Calvin MACKLIN,
Defendant-Appellant.**

**No. 56, Docket 81–1040.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 22, 1981.

Decided Jan. 25, 1982.

Steven Lloyd Barrett, New York City (The Legal Aid Society, Federal Defender

Services Unit, New York City, of counsel), for defendant-appellant Dennis Calvin Macklin.

Patricia Anne Williams, Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., Walter P. Loughlin, Asst. U. S. Atty., New York City, of counsel), for appellee U. S.

Before NEWMAN and KEARSE, Circuit Judges, and DALY, District Judge.*

DALY, District Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York (Carter, J.), entered upon a jury verdict convicting defendant-appellant of two counts of kidnapping in violation of 18 U.S.C. § 1201(a).[1] Appellant asserts two grounds for appeal: (1) the evidence adduced at trial was insufficient to prove the elements of the federal crime of kidnapping; and (2) the trial court's instructions to ·the jury on the elements of kidnapping were erroneous.

### A. The Facts

From the evidence at trial unfolded a tale of a two-week Los Angeles to New York odyssey which appellant Macklin, an adult, took with a 13-year-old boy named Bruce Rowe, their New York encounter with an 11-year-old girl named Selestine Valdez, and a brief, though round-about journey from New York to Philadelphia which Macklin subsequently took with Selestine.

On July 10, 1980, Bruce Rowe ran away, for the ninth time in a year, from his suburban Los Angeles home. On this occasion, Bruce was accompanied by his ten-year-old friend, Derwon. The two boys walked to downtown Los Angeles, where they wandered around until very late that night when they were approached by an unidentified man who solicited their help in burglarizing a house. It was then that appellant Macklin happened by and chased the would-be burglar away. In response to his inquiries, Bruce and Derwon told Macklin that they had run away from home, but refused to identify their parents.

Bruce testified that Macklin and the boys "became friends" after about 10 minutes of conversation, and Macklin told them he would take care of them. To avoid having to return home if police found them, the boys adopted pseudonyms, with Derwon becoming "Lee" and Bruce becoming "Brian". There was conflicting evidence as to whether it was Macklin's or the boys' idea to change their identities.

Macklin and the boys stayed three days in California, spending their nights sleeping in train stations and their days playing in parks and begging for money, which they used for food. At some point, Macklin asked them if they wanted to go with him to New York City. Bruce and Derwon both asked Macklin if he would buy bicycles and other toys for them. Derwon testified that Macklin told him he'd have a bike waiting for him in New York, "if I don't say nothing on the train ... [about] ... I wanted to get off". Bruce's version of the Macklin-Derwon bicycle conversation was that Macklin said "if he [Derwon] will still be with us when we got to New York, he [Macklin] would get it for him, too".

After three days, Macklin, Bruce and Derwon went to the Los Angeles train station to hop a train to New York, with Macklin instructing the boys on how to sneak into the baggage car of the train. When the train finally arrived, however, Derwon refused to go and ran away leaving Bruce and Macklin on their own. Macklin and Bruce ultimately left California by bus, and then proceeded to journey across the country alternating between buses and

---

* Honorable, T. F. Gilroy Daly, Judge, United States District Court for the District of Connecticut, sitting by designation.

1. The statute provides in pertinent part:
   § 1201. Kidnapping
   (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person ... when
      (1) the person is wilful transported in interstate or foreign commerce

   .     .     .     .     .

   shall be punished by imprisonment for any term of years or for life.

trains. During the course of the trip and thereafter, Bruce identified himself to other people as appellant's son, "Brian Macklin", apparently at Macklin's suggestion. The two arrived in New York City on July 16, 1980 and spent their first night in the city in Central Park. The next two nights were spent in the homes of friends of Macklin.

Sometime during their first few days in New York, Macklin bought some new clothes for Bruce and took him to two different homes for runaways. However, after talking to some people at the homes, Bruce decided he didn't want to stay, and so continued with Macklin. During this same period, Macklin placed a telephone call to Bruce's mother. Bruce stood nearby as Macklin dialed the number, but then walked away and did not hear Macklin converse with his mother. When he hung up the phone, Macklin told Bruce that his mother had said she did not want Bruce to come home. Bruce testified that he was upset that his mother had said that she did not want him to come home, but not surprised, since she had told him the same thing once before during a previous sojourn away from home. Apparently in an effort to disprove that Macklin had in fact spoken to Bruce's mother, the government produced Wayland Rowe, Bruce's father, who testified that he learned nothing about his son's whereabouts until he was later contacted by New York authorities.

On Sunday, July 20th, 1980, Macklin took his friend's two daughters and three other children as well as Bruce to a swimming pool in Van Cortland Park. It was there that Macklin and Bruce met up with Selestine Valdez, who had been brought to the pool by her grandfather. Early in the day Macklin and Selestine's grandfather struck up a conversation and Macklin introduced Selestine to Bruce, whom he described as his son, "Brian".

Bruce and Selestine took an immediate liking to each other and went off to play together in the pool. Later that afternoon, Selestine told both Bruce and Macklin that she was beaten by her mother and stepfather and was very unhappy at home.

Macklin responded by telling Selestine that it was against the law for adults to beat children and suggested that Selestine travel to Oregon with him and Bruce. Selestine turned down the invitation.

The following day Bruce and Macklin returned to Van Cortland Park, and Bruce went from there to Selestine's house, leaving Macklin in the park. That afternoon, Bruce and Selestine went next door to the home of Selestine's friend Lucia, whose family was holding a barbecue. At the party, Bruce gave Selestine a chain necklace, which Macklin had obtained for Bruce to give to her and asked her to come with him and Macklin to New Jersey, where Macklin had told him he was going to look for work. Shortly thereafter, either at Selestine's request or on his own initiative, Bruce went back to the park to find Macklin and invite him to the barbeque. Macklin returned to the party with Bruce, but stayed only long enough to meet Selestine's mother and stepfather who had appeared upon the scene. Bruce remained a while longer with Selestine, and then rejoined Macklin in the park. There, the two of them composed a "thank you" note to Selestine, and Macklin drew a cartoon of "Woody Woodpecker" on the bottom of the note. Bruce delivered the note to Selestine that same evening and then again returned to Macklin in the park.

Later that night, Selestine was sent on an errand by her mother, but, once out of the house, she went instead to Macklin and Bruce in the park. According to Bruce's testimony, Selestine had a black eye from being struck by her stepfather. Selestine announced to Bruce and Macklin that she had come to tell them that she would not go away with them. Bruce pleaded with her to come. Macklin, however, merely made some remarks to Bruce, reminding him that it was Bruce who wanted Selestine to join them and he [Macklin] had predicted that Selestine would not come. Selestine suddenly changed her mind and said she would join them because, she testified, Bruce kept asking her to do so. Selestine then asked if she could bring her baby brother, but Mack-

lin ruled that out because her brother was "a different color" than Macklin and "wouldn't pass".[2]

Macklin, Bruce and Selestine spent the next two days and a night in Central Park. Bruce and Macklin then got into an argument, and Macklin struck Bruce when Bruce began, as he stated in court, "acting smart" after Macklin told him to pick up the shirt that Macklin had washed out for him. Macklin began walking away with Selestine, and Bruce followed until Macklin told him again to retrieve his shirt, which he finally went back to do. When Bruce returned to where he had left Macklin and Selestine, they had disappeared.

Bruce then went to a telephone booth and called the police. He gave the police a phony name and address, and continued to keep his real identity secret from the authorities until after he was placed in a foster home in New York. He subsequently ran away from this foster home, and, after being found, was placed in a second foster home. At the time of appellant's trial, Bruce was still in the New York home.

Meantime, Macklin and Selestine went to Pennsylvania Station and sneaked onto a train, which they believed was headed for Chicago, but which, in fact, was bound for Washington, D.C. In Washington, they were caught trying to sneak on board another train, and ended up sleeping in the station. Over the next couple of days, Macklin and Selestine travelled to Alexandria, Virginia, Baltimore, Maryland, and Philadelphia, Pennsylvania, where they were stopped by an Amtrak police officer and later arrested by the FBI.

There was also evidence regarding the home lives of both Bruce and Selestine. The testimony, although somewhat conflicting, indicated that, while their lives might not have been as difficult as either Bruce or Selestine might have perceived them to be, they were, to one degree or another and for a variety of reasons, not the happiest of situations. Bruce's father and Selestine's mother both testified that they never consented to their children's travelling with Macklin.

### B. *The Jury Instructions*

The government has proceeded in this case, from the indictment through to this appeal, on the theory that a minor (defined by the government in this case as anyone under 16 years of age) is, under any and all circumstances, legally incapable of consenting to travel away from home with an unrelated adult. Therefore, the government contends that, although consent or acquiescence of the alleged victim is normally a complete defense to a kidnapping charge, when the victim is a minor it is the will and consent of the parent or parents which govern. Although the trial judge expressed disagreement with the government's theory, the jury instructions, perhaps inadvertently, contained language that permitted the jury to apply the theory in considering two of the three elements of kidnapping.[3] The material portion of the trial court's charge to the jury was as follows:

> "As I said, the first element you must find that the government has proved beyond a reasonable doubt [is] that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted or carried away Bruce Rowe and Selestine Valdez....
>
> 'Unlawfully' simply means contrary to law. 'Kidnap' means to take and carry away a person by force and against his or her will. 'Seize,' 'confine,' 'abduct,' and 'carry away' all mean the taking and carrying away of a person, or a holding of someone by force or without that person's consent. *Or, in the case of minors, without the consent of the minor's parents.*

2. This remark apparently refers to the fact that Selestine, like Macklin, but unlike all the members of her family except her natural father, was black. The evidence indicates that Selestine was the brunt of a good deal of taunting because of the difference in color between her and her family.

3. The three elements of the crime of kidnapping—taking, holding, and transporting in interstate or foreign commerce—are set out in the text of the relevant portion of the statute quoted in footnote 1.

'Inveigle' means to entice, lure or lead astray, by false representations or promises, or by other deceitful means. 'Decoy' means enticement or luring by means of some fraud, trick or temptation.

. . . .

The second element you must find beyond a reasonable doubt is that the defendant held the children for ransom, reward or otherwise. In order for you to conclude that Mr. Macklin held either Bruce Rowe or Selestine Valdez within the meaning of the Kidnapping Act, as charged in the indictment, you must find that he unlawfully restrained the children, either mentally or physically restrained them, for an appreciable period of time *against their will or the will of their parents,* and that the defendant had a wilful intent so to confine the children."

(Emphasis added.) Defense counsel objected, specifically pointing out that the instructions permitted conviction upon a finding that the children did not have their parents' consent.

█ The trial judge erred in his instructions concerning the federal law of kidnapping. The very nature of the crime of kidnapping requires that the kidnapper use some means of force—actual or threatened, physical or mental—in each elemental stage of the crime, so that the victim is taken, held and transported against his or her will. As the Supreme Court stressed in the leading case of *Chatwin v. United States,* 326 U.S. 455, 464, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946), it is "the involuntariness of seizure and detention which is the very essence of the crime of kidnapping." The jury instructions here substituted the will of the minor's parents for that of the actual victim. Yet, the statute itself makes no special provision for children-victims.[4]

Furthermore, the Supreme Court in *Chatwin* rejected any *per se* rule of incapacity based on the age of the victim, at least in cases where the victim is over the age of 10. *Id.,* 326 U.S. at 461, n.4, 66 S.Ct. at 236 n.4. The defendant in *Chatwin* had been convicted of kidnapping his 15-year-old housekeeper who the parties agreed possessed the mentality of a seven-year-old. The girl had entered into a cult marriage with Chatwin, who transported the girl to Mexico, where they were legally married, and then to Arizona, where they lived in hiding as husband and wife until discovered by federal authorities.

█ Finding no "unlawful physical or mental restraint", the Supreme Court overturned Chatwin's conviction, rejecting the government's contention that, because of the girl's young physical age and even younger mental age, her parents' will and consent should govern. The Court noted that, "[i]f the victim is of such an age or mental state as to be incapable of having a recognizable will, the confinement then must be against the will of the parents or legal guardian of the victim." *Id.,* 326 U.S. at 460, 66 S.Ct. at 235. However, the court went on to hold that any such incapacity of the victim must be shown by "competent proof beyond a reasonable doubt . . . in relation to the very acts in question" before criminal liability could be imposed. *Id.,* 326 U.S. at 462, 66 S.Ct. at 236. Incapacity of a "consenting" victim was thus established as an essential element of kidnapping, which, like all other elements, must be proved by the prosecution beyond a reasonable doubt.[5]

---

4. There is one exception, not here relevant, for the taking of a minor by the child's parent.

5. *Chatwin* did not hold, nor do we in any way imply, that consent of a child-victim's parent or guardian could never be a factor, or even a controlling factor, in a kidnapping case. *Chatwin* merely held that incapacity or lack of a "recognizable will" cannot be presumed, but must be proved beyond a reasonable doubt. Quite obviously, if the victim is an infant, the absence of a "recognizable will" speaks for itself, and the will or consent of the parent or guardian would control. How far up the age continuum a victim would have to be before the lack of such a will would cease being self-evident is an issue which *Chatwin* did not address, nor need we do so here as both of the minors involved in this case exceeded the mental age of the victim in *Chatwin.*

Furthermore, the parent's or guardian's will could control for one element of the crime but not for all. For example, if the victim did have a recognizable will when first taken or induced into accompanying the accused, but it is shown

The instructions to the jury in this case were thus directly contrary to the federal law of kidnapping as interpreted by the Supreme Court in *Chatwin*. In defining a physical "taking" as a taking or carrying away of a person by force, "[o]r in the case of minors without the consent of the minor's parents", the trial court presented the jury with a rule of capacity based entirely on the age of the victim.[6] Furthermore, although the trial judge apparently sought to distinguish between physical takings (seizing, confining, kidnapping, abducting and carrying away) and nonphysical takings (inveigling and decoying) and did not include the instructions regarding parental consent in defining "inveiglement" or "decoying", the instructions as a whole left the jury with the erroneous impression that simply because Bruce and Selestine, as minors, accompanied appellant without their parents' consent, appellant could be held criminally liable for kidnapping. This impression was solidified by the further instruction that the "holding" element would be satisfied if the jury found that appellant had "restrained [the children] . . . against their will *or* the will of their parents."[7] (Emphasis added.) The government's theory and the trial court's instructions thus precluded any factual determination of the children's incapacity, which *Chatwin* held must be proved beyond a reasonable doubt, establishing instead an irrebuttable presumption or rule of incapacity based solely on the minority status of the two children, a rule which, as already noted, *Chatwin* specifically rejects.

### C. *The Sufficiency of the Evidence Claim*

Although the failure correctly to charge the jury on the essential elements of the crime charged by itself requires reversal of appellant's conviction, *see United States v. Montiell*, 526 F.2d 1008, 1010 (2d Cir. 1975); *United States v. Natale*, 526 F.2d 1160, 1167 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), we believe that examination of the record discloses that the government failed to produce sufficient evidence for the case to have been submitted to the jury and, therefore, that the indictment should be dismissed.

It is axiomatic that, in a criminal case, the government must prove each and every element of the crime beyond a reasonable doubt. *In Re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). As already noted, the kidnapping statute[8] sets forth three elements of the crime: the victim must be unlawfully taken, coerced, or deceived into accompanying the accused nonconsensually; he or she must be held by the accused for ransom, reward or otherwise; and he or she must be transported in interstate or foreign commerce. Additionally, where the alleged victim is a person who "voluntarily" accompanied the accused, *Chatwin* requires proof of that person's incapacity to consent before criminal liability may be imposed.

In regard to the first element of kidnapping, the statute specifies seven methods by which a victim may be "taken." Five of these terms—seizing, confining, kidnapping, abducting, and carrying away—involve an actual physical or bodily carrying

---

that, subsequently, that will was overcome by brainwashing or some other mind-control technique, the consent of the parent or guardian might govern the holding element, while the victim's will might control the taking element.

6. "Take" is an ambiguous word, particularly when one is speaking of an adult "taking" a child somewhere, which could be construed as simply guiding or accompanying the child, or as a forcible taking. The instructions, as given, permitted the jury to construe the mere act of guiding or accompanying a child without the parents' consent as equivalent to a forcible taking.

7. Such an interpretation was no doubt further reinforced by the wording of the indictment, which the jury requested and received during their deliberations and which did not distinguish either between the various statutory means of taking or between the elements of the crime, but merely charged appellant with seizing, confining, inveigling, decoying, kidnapping, abducting, carrying away *and* holding the children "without the consent, permission or knowledge of [their] parents". (Emphasis added.)

8. *See* fn. 1.

away or restriction of the victim. The remaining two methods—inveigling or decoying—involve nonphysical takings by which the kidnapper, through deception or some other means, lures the victim into accompanying him. The government concedes that there was no physical taking involved in this case, asserting only that Bruce and Selestine were "inveigled," which may be defined as enticing, cajoling, or tempting the victim, usually through some deceitful means such as false promises. Webster's Third New International Dictionary (1966).

As evidence of appellant's asserted inveiglement of Bruce the government points to the California conversation in which appellant promised Bruce and his friend bicycles when they got to New York; appellant's report to Bruce of his mother's statement that she did not want Bruce to return home; and the fact that appellant's lifestyle presented Bruce with the opportunity to play in parks and eat in fast-food restaurants.

The record shows that it was Bruce and Derwon who first asked for the toys, and that Derwon, three years younger than Bruce chose *not* to accompany appellant, despite the promise of a bike. As to appellant's relaying Bruce's mother's disavowance of her son, there was no evidence to contradict the message. Bruce's father's testimony that *he* did not know where Bruce was until long after the telephone call does not serve that purpose. Moreover, Bruce's testimony that his mother had previously told him she did not want him home supports appellant's report to Bruce. Finally, to characterize appellant's lifestyle as an inducement would be to equate attractiveness to inveiglement and kidnapping. The severe penalties that accompany the federal crime of kidnapping were not meant to be imposed on Pied Piper characters who do no more than attract runaway children. The fact is, that by the time Bruce met up with Macklin, he had already run away from home. On the proof, appellant did not induce Bruce to leave his family.

As to Selestine, the government contends that she was "inveigled" by appellant's black skin which matched her own; by his statement to her·that it was against the law for adults to strike children; by his drawing of a cartoon on the "thank you" note that appellant and Bruce wrote to her; and by his providing Bruce with a chain to give to her.

This evidence, viewed in the light most favorable to the government, *United States v. Ruffin*, 575 F.2d 346 (2d Cir. 1978), is not sufficient to show that Selestine was inveigled into leaving home and travelling with appellant. Certainly, appellant cannot on the evidence in this case be held criminally liable because his skin color was the same as Selestine's or because he told her adults should not hit children, or because he drew a cartoon for her. As to the chain, there is no evidence that Selestine even knew that appellant had provided it (or that she viewed it or that appellant intended it as an inducement to her to run away from home). The evidence does show that Selestine was attracted to Bruce, and, if there was any inducement for Selestine to leave home—other than her family situation, which she, at least, perceived to be unhappy—it came from 13-year-old Bruce, not appellant. The record is barren as to why Selestine remained with appellant after they had parted company with Bruce.

Even viewing the above evidence in the light most favorable to the government and drawing all permissible inferences in its favor, *United States v. Ruffin, supra*, 575 F.2d at 353–54, we are unable to say that a reasonable mind might fairly conclude beyond a reasonable doubt that appellant was guilty of inveigling either Bruce or Selestine. *See United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

■ Furthermore, even if there was sufficient evidence of inveiglement, there is no evidence whatsoever that either of the children was "held" or "transported" against his or her will. Rather, the evidence indicates that both children were free to come and go as they pleased, to speak to other people, and to leave appellant at any time they wished. The government's argument that the children became financially dependent on appellant and therefore were forced to remain with him does not satisfy

the basic minimum requirement of criminal law that there be some wrongful act by the accused. Nor does it comport with logic in this case. If the children had the gumption to run away from their families and homes, they certainly had the nerve to leave appellant, if they chose, as, indeed, Derwon had done and Bruce did when he became so inclined.

 In conclusion, we believe, upon examination of the entire record, that the jury in this case did not convict and could not have convicted appellant on the basis of the evidence, but rather on the basis of the erroneous jury instructions, discussed *supra.* Therefore, the judgment of conviction is reversed and the indictment is ordered dismissed.[9]

**9.** The Government has moved to dismiss this appeal on the ground that Macklin has failed to maintain contact with his probation officer. Macklin was sentenced to a term of one year on count one, which he has served, and on count two, imposition of sentence was suspended and he was placed on probation for three years. An appellate court may and normally will decline to exercise its jurisdiction with respect to a defendant who escaped from custody pending review of his conviction. *See Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586. We need not decide whether that principle would apply to an appeal by a defendant who absconds from probation when probation is the only operative portion of a sentence. Here, the appellant has served the sentence imposed on count one, and it would be singularly inappropriate to compound that unfortunate circumstance by declining to adjudicate the merits of the conviction because of Macklin's apparent default with respect to the probation imposed on count two. Moreover, since the legal issues arising under both counts are virtually identical, we also think it would be inadvisable to decline to exercise jurisdiction with respect to count two. We therefore deny the motion to dismiss the appeal.