**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ramiro CARRION–CALIZ,**
**Defendant–Appellant.**

**No. 90–2809.**

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1991.

On Suggestion for Rehearing
En Banc Nov. 21, 1991.

Roland E. Dahlin, Federal Public Defender, Daniel H. Wannamaker, Asst. Federal Public Defender, Houston, Tex., for defendant-appellant.

Jeffrey A. Babcock, Paula C. Offenhauser, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before KING, JOHNSON, and EMILIO M. GARZA, Circuit Judges.

JOHNSON, Circuit Judge:

Ramiro Carrion–Caliz appeals from his conviction on three counts of violating the Hostage Taking Act, 18 U.S.C. § 1203, asserting that the Government failed to produce sufficient evidence to convict him. Carrion also argues that the district court erred by imposing a sentence greater than the statutory maximum sentence applicable to his offenses. While this Court will affirm Carrion's conviction, we remand the case for resentencing.

I. Facts and Procedural History

While in Guatemala City, Guatemala in early 1990, Carrion met Luisa Amanda Cuaresma and her family—her two young granddaughters, Leticia Mercedes and Ivania Del Carmen, and Luisa's niece, Maria Teresa Cuaresma. Luisa told Carrion that the four of them would like to go to the United States to visit Luisa's daughter, Lesbia Cuaresma–De Fatima, who lived in Miami, Florida. For a fee of $2,000 Carrion agreed to transport the four women to Brownsville, Texas. Carrion accompanied the family to Mexico City, where Luisa asked Carrion for help in securing additional funds from Lesbia in Miami. Carrion telephoned Lesbia, telling her that her family was "in his power" and instructed Lesbia to wire $650. Lesbia complied. Although Luisa had already paid Carrion the full $2,000 fee in Guatemala, Carrion kept $600 of the money Lesbia sent and gave Luisa only $50.

On March 18, 1990, Carrion and another individual named Santos helped the four family members cross the Rio Grande River into the United States. Upon their arrival in the United States, Maria Teresa was separated from the rest of the family and taken to Casa Romero in Brownsville, Texas. Santos took Luisa and her granddaughters to Carrion's home in Brownsville, where they remained for about eight days. Luisa testified—through an interpreter—that during that time she and her granddaughters stayed in a single small room and never left the house because Carrion had warned her and the girls that if they left they would be captured by immigration officials and deported. Luisa further testified that she was very nervous while in Carrion's hands, and her daughter, Lesbia, testified that Luisa appeared to have suffered a nervous breakdown of some sort during her ordeal. Finally, Luisa testified that she did not know where

she was, did not know how to go anywhere in the United States, and did not have any money. Luisa speaks little or no English, and has had virtually no formal schooling.

Soon after secreting Luisa and the girls in his house, Carrion telephoned Lesbia again, informing her that her family had arrived safely in the United States but were still under his control. Over the next few days, Carrion made more telephone calls to Lesbia to demand more money, initially demanding $5,000 and then reducing his demand to $3,000. Carrion told Lesbia that if she did not send the money, Luisa and the girls would "disappear." Lesbia decided not to comply with Carrion's demands. Instead, she and her husband, Leonardo Lopez, travelled to Brownsville and informed authorities of the situation. Under the supervision of United States officials, Lesbia made arrangements to pay Carrion the amount he demanded. When Carrion showed up to collect the money, he was arrested. Luisa and her two granddaughters were released.

Carrion was indicted on fourteen counts: eleven counts involved crimes of illegally bringing aliens into the country and three counts involved hostage taking. The district court directed verdicts in favor of Carrion on two of the counts relating to illegal aliens, and the jury convicted Carrion on all of the remaining twelve counts, including the three counts of violating the Hostage Taking Act, 18 U.S.C. § 1203.[1] The district court imposed sentences of 168 months on each of the twelve counts, all of the sentences to run concurrently. In addition, the district court imposed a five year term of supervised release and, for each count, a special assessment of $50. Carrion timely appeals both from his convictions under the Hostage Taking Act and

from the sentence imposed by the district court.

## II. Discussion

### A. Carrion's Conviction for Hostage Taking

#### 1. Standard of Review

■ When presented with a claim that the evidence was insufficient to support a criminal conviction, this Court reviews the judgment of the district court to determine whether, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the conviction beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Hopkins*, 916 F.2d 207, 212 (5th Cir.1990). While an inquiry into the sufficiency of the evidence ordinarily is fairly straightforward, this case presents a particular difficulty: no court has yet identified the essential elements of a conviction for hostage taking.

#### 2. The Hostage Taking Act

■ The Hostage Taking Act, adopted by Congress in 1984, provides:

(a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or to abstain from any act as an explicit or implicit condition for the release of the person detained, or attempts to do so, shall be punished by imprisonment by any term of years or life.

---

**1.** In addition to the three counts appealed from, the jury also convicted Carrion of the following: 1) conspiracy to bring into and land certain aliens within the United States, 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(1)(A); 2) & 3) two counts of aiding and abetting the bringing into and landing certain aliens within the United States, 8 U.S.C. § 1324(a)(1)(A) and 18 U.S.C. § 2; 4) conspiracy to transport certain aliens within the United States, 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(1)(B); 5), 6), & 7) three counts of aiding and abetting the transporting of certain aliens within the United States, 8 U.S.C. § 1324(a)(1)(B) and 18 U.S.C. § 2; 8) conspir-

acy to harbor certain aliens within the United States, 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(1)(C); and 9) harboring certain aliens within the United States, 8 U.S.C. § 1324(a)(1)(C) and 18 U.S.C. § 2.

The district court instructed the jury to render a verdict in favor of Carrion on one count of aiding and abetting the bringing into and landing certain aliens within the United States, 8 U.S.C. § 1324(a)(1)(A) and 18 U.S.C. § 2, and one count of aiding and abetting the transporting of certain aliens within the United States, 8 U.S.C. § 1324(a)(1)(B) and 18 U.S.C. § 2.

18 U.S.C.A. § 1203(a) (West Supp.1991). Thus, by the plain terms of the statute, a conviction under the Hostage Taking Act requires the Government to show that the defendant 1) seized or detained another person, 2) threatened to kill, injure, or continue to detain that person, 3) with the purpose of compelling a third person or governmental entity to act in some way, or to refrain from acting in some way.

There is little question here that the evidence against Carrion was sufficient to establish the second and third of these elements. Taken in the light most favorable to the Government, the evidence showed that when Carrion spoke to Lesbia, he told her that Luisa and her family were in his power, and that they would disappear if Lesbia did not pay him the money he demanded. Plainly, the jury could have found that he threatened to injure or to kill Luisa and the girls in order to compel Lesbia to pay him. The only real question concerns the first element of the offense: did Carrion "seize" or "detain" Luisa and the girls within the meaning of the Act? Answering this question is complicated by the fact that the Act itself does not indicate what it means by "seize" or "detain." Moreover, there is precious little legislative history, and even less case law, to aid in construing the Hostage Taking Act. Accordingly, the Court will look to an analogous statute—the federal kidnapping statute, 18 U.S.C. § 1201—and the jurisprudence that has developed under it, to guide our construction of the Hostage Taking Act.

3. Similarities Between the Hostage Taking Act and the Federal Kidnapping Statute

Initially, we note that the federal kidnapping statute and the Hostage Taking Act are quite similar, so that it is reasonable to look to one for help in deciphering the other. The two acts are codified together in Chapter 55 of Title 18, and they contain similar language. Like the Hostage Taking Act, which makes it illegal to "seize" or "detain" another person, the kidnapping statute makes it illegal, among other things, to "seize" or "confine" another person. 18 U.S.C. §§ 1201(a), 1203(a). This similarity in the language of the statutes pervades the cases as well; when interpreting the kidnapping statute the Supreme Court, this Court, and others have repeatedly used the term "detention" as a synonym for, or in place of, the term "confinement." *See, e.g., Chatwin v. United States,* 326 U.S. 455, 464, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946) ("involuntariness of seizure and detention ... is the very essence of the crime of kidnapping"); *United States v. Johnson,* 514 F.2d 92, 94–95 (5th Cir.1975) (evidence showed involuntary "detention"); *United States v. Young,* 512 F.2d 321, 323 (4th Cir.1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976) (involuntary "detention" key element of kidnapping); *Gawne v. United States,* 409 F.2d 1399, 1403 (9th Cir.1969), *cert. denied,* 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970) (same).

In addition to their similar language, both statutes punish similar conduct. While kidnapping might be more commonly associated with attempts to force individuals to pay ransom, and hostage taking with attempts to influence the behavior of governments (or governmental organizations), the two statutes overlap to a considerable degree. The Hostage Taking Act, by its plain language, applies to attempts to coerce both individuals *and* governments to act or refrain from acting in some way specified by the hostage takers. Similarly, the Supreme Court has held that the language of the kidnapping statute is broad enough to cover kidnappings undertaken out of non-pecuniary motives. *E.g. Gooch v. United States,* 297 U.S. 124, 126–29, 56 S.Ct. 395, 396–97, 80 L.Ed. 522 (1936) (inclusion of words "or otherwise" in kidnapping statute signals Congressional intent to give act broad application); *United States v. Healy,* 376 U.S. 75, 81, 84 S.Ct. 553, 557, 11 L.Ed.2d 527 (1964) ("a nonpecuniary motive [does] not preclude prosecution under the [kidnapping] statute"). For instance, this Court has held that a disgruntled patient who held a nurse captive in a Veterans' Administration hospital for several hours in an attempt to force the VA to provide him with better treatment could

be convicted under the kidnapping statute. *United States v. Crosby*, 713 F.2d 1066, 1071 (5th Cir.), *cert. denied*, 464 U.S. 1001, 104 S.Ct. 506, 78 L.Ed.2d 696 (1983).

In light of the persistent similarities between the kidnapping statute and the Hostage Taking Act, the question that arises is whether the two statutes are in fact redundant; if they are, there would be good reason to question our conclusion that the two statutes overlap and are quite similar, as it would not be reasonable to expect the Congress to adopt redundant statutes. The Court is confident, however, that the two statutes are not redundant. They carry different jurisdictional requirements.

The kidnapping statute applies only to those situations in which 1) the victim is a foreign official or designated official of the United States government, 2) the kidnapping takes place within the special maritime, territorial, or aircraft jurisdiction of the United States, or 3) the victim is transported in interstate or foreign commerce. 18 U.S.C. § 1201(a)(1)–(a)(5). Thus, the federal kidnapping statute does not apply to all acts of kidnapping or hostage taking. In particular, the kidnapping statute has only limited extraterritorial application— that is, application to acts that occur beyond the borders of the United States. *See United States v. McRary*, 665 F.2d 674, 678 (5th Cir. Unit B 1982), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307 (1983) (phrase "transports in foreign commerce" in kidnapping statute requires that victim be kidnapped in U.S. and then transported to foreign state); *United States v. McInnis*, 601 F.2d 1319 (5th Cir.1979).

■ The Hostage Taking Act, by contrast, was adopted specifically "to extend jurisdiction over extraterritorial crimes and satisfy the country's obligations as a party to various international conventions." *United States v. Yunis*, 681 F.Supp. 896, 904 (D.D.C.1988).

Congress enacted the Hostage Taking Act to meet its obligations as a signatory state to the Hostage Taking Convention. Article 5 of that treaty required signato-ry states to extend jurisdiction over hijacking committed outside the United States when the offender was a citizen of the states, or "present" in the state. It also provided states with the discretion to assert jurisdiction when their nationals were taken hostage. Congress' voluntary decision to adopt this permissive basis of jurisdiction underscores its intent to exercise broad jurisdiction over any offender who threatens American nationals.

*Id.* at 905 (citations omitted). Because it deals with international acts of kidnapping or hostage taking, the Hostage Taking Act applies *only* to acts of kidnapping or hostage taking which have some international aspect or involve the United States government. If the act of kidnapping or hostage taking at issue does not involve the United States government, and has no international aspect, then the Hostage Taking Act does not apply.

(b)(1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C.A. § 1203(b) (West Supp.1991).

In view of the distinct jurisdictional requirements of each of the two acts, the Court is convinced that the two statutes are not redundant.[2] At the same time, as a

---

**2.** The distinct jurisdictional requirements of the two acts may also explain why Carrion was charged with hostage taking, but not with kid-napping. Of course, the Court can only speculate as to the reasons that the indictment included only hostage taking and not kidnapping,

result of the otherwise similar and overlapping provisions of the two statutes, the Court is equally convinced that, at least as to the non-jurisdictional elements of the offenses, it is appropriate to look to the jurisprudence that has developed under the kidnapping statute for guidance in interpreting the Hostage Taking Act.

### 4. To Seize or Detain

As noted above, a conviction under the Hostage Taking Act requires the Government to show that the defendant 1) seized or detained another person, 2) threatened to kill, injure, or continue to detain that person, 3) with the purpose of compelling a third person or governmental entity to act in some way, or to refrain from acting in some way, and there is little question here that the evidence against Carrion was sufficient to establish the second and third of these elements. The remaining question is whether Carrion "seized" or "detained" Luisa and her granddaughters within the meaning of the Hostage Taking Act. · As noted above, due to the absence of any guidance from the Hostage Taking Act beyond the language of the statute itself, the Court will look to the federal kidnapping statute for assistance in divining the correct interpretation of the terms "seize" and "detain."

■ "The act of holding a kidnapped person for a proscribed purpose," the Supreme Court has explained, "necessarily implies an unlawful physical or mental restraint for an appreciable period against that person's will and with a willful intent so to confine the victim." *Chatwin,* 326 U.S. at 460, 66 S.Ct. at 235. The courts of appeals have echoed this principle. A former Chief Judge of this Circuit, J.P. Coleman, has

written that the crucial fact is that the victim "is being detained ... against his or her will," *United States v. Chancey,* 715 F.2d 543, 547 (11th Cir.1983), and other courts have held that "[u]nlawful seizure and holding are the essential elements of the kidnaping offense." *United States v. Lewis,* 662 F.2d 1087, 1088 (4th Cir.1981). *See also United States v. Lorick,* 753 F.2d 1295, 1297 (4th Cir.1985). In light of these kidnapping principles, this Court holds that a hostage is "seized" or "detained" within the meaning of the Hostage Taking Act when she is held or confined against her will for an appreciable period of time.

■ It is important to note what the Hostage Taking Act does *not* require. First, to seize or detain a hostage, a hostage taker need not use, or even threaten to use, *physical* force or violence. The cases clearly hold that non-physical restraint—for instance, fear or deception— can be sufficient to restrain a person against her will. For instance, in *United States v. Wesson,* 779 F.2d 1443 (9th Cir. 1986), the Ninth Circuit upheld a kidnapping conviction where the victim was restrained by fear. In *Wesson* a long-haul truck driver took a young girl on one of his trips. Even though there was no indication that the victim was physically confined within the cab of the truck at all times, the court upheld Wesson's kidnapping conviction on the basis of the victim's testimony that "she continued on the journey despite being raped and beaten because she was terrified of the consequences if caught trying to escape." *Id.* at 1444. Also, kidnapping convictions have been meted out to kidnappers who deceive their victims into accompanying them, or into remaining with

---

but it certainly is possible that the Government believed that Carrion could not be convicted of kidnapping because his actions did not fall within the jurisdiction of the kidnapping statute. For Carrion to be convicted under the kidnapping statute, the Government would have to show that he transported Luisa and the girls in interstate or foreign commerce *after* he had seized or confined them. *See McRary,* 665 F.2d at 678 ("[T]he foreign commerce jurisdictional basis [of the kidnapping statute] mandates that the kidnapping take place in the United States and that the victim be subsequently transported to a foreign State.").

Thus, if Carrion did not seize or confine Luisa and the girls until after he brought them across the Rio Grande, then he might not be subject to the federal kidnapping statute (though he might still be prosecuted under state law). Since Carrion, Luisa, and the girls are all foreign nationals, however, and since the Hostage Taking Act does not impose a requirement that the hostages be transported in foreign commerce, Carrion's conduct does fall within the ambit of the Hostage Taking Act.

226

them. In *United States v. Hoog*, 504 F.2d 45 (8th Cir.1974), *cert. denied*, 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975), the court rejected the defendants' argument that the Government had not proved that they had restrained the victims against their will.

> This argument is frivolous. Uncontradicted testimony of each victim discloses that either [one defendant or the other] induced each of them to accept a ride by false representations. Once they had accepted a ride, [the defendants] lured or enticed each of them—again by false promises—to stay in the vehicle during its roundabout course....

*Id.* at 50–51. In sum, the Court concludes that the Government need not show that Carrion physically restrained or confined Luisa and her granddaughters, or that he threatened them with physical force or violence.[3] It is enough that he frightened or deceived them sufficiently to cause them to remain in his house when they would have preferred to join Lesbia in Miami.

■ Second, the Hostage Taking Act does not require that the seizure or detention of the hostage be against the hostage's will from its inception. That is, the fact that the hostage may initially agree to accompany the hostage taker does not prevent a later "seizure" or "detention" within the meaning of the Hostage Taking Act. In the recent case of *United States v. Eagle Thunder*, 893 F.2d 950, 953 (8th Cir.1990), the Eighth Circuit stated that "[e]ven if [the victim] had initially consented to accompanying [the kidnapper], that fact would not prevent the occurrence of a kidnapping because [the kidnapper] thereafter detained [the victim] despite her repeated requests to be taken home or to her mother." *See also United States v. Redmond*, 803 F.2d 438, 439 (9th Cir.1986) ("The fact that one originally accompanies another without being forced does not prevent the occurrence of a kidnapping where force is later used to seize or confine the

victim."). Thus, while the initial acquiescence of the victim may be relevant to determining whether she was ever held against her will, it is not dispositive of the question, and it does not preclude a conviction for hostage taking.

### 5. The Evidence Against Carrion

■ Evaluated in the light of these standards, it is clear that the evidence against Carrion was sufficient to allow the jury to convict him of hostage taking. For one thing, Carrion himself represented to Lesbia that Luisa and the girls were in his control, clearly indicating that at least he believed that he had seized or detained Luisa and the girls. Moreover, as noted above, Luisa testified that she and her granddaughters remained at Carrion's house because Carrion had warned her that if they left the house, she and her granddaughters would be apprehended by immigration officials and deported. In addition, when Carrion secreted Luisa and the girls in his house, he knew that Luisa was in an unfamiliar country, that she did not speak the language, and that she had no resources which might enable her to escape. The combination of these disabilities and Carrion's deceptions, especially when considered in light of Carrion's own statements to Lesbia that Luisa and the girls were within his power, were certainly enough to allow the jury to conclude that Carrion had "detained" Luisa and the girls within the meaning of the Hostage Taking Act.

Carrion now maintains that Luisa and the girls voluntarily went to his house, that he never threatened them with injury if they left, that he did not physically restrain them, and that they were always free to leave. None of these contentions is of any help to Carrion. As discussed above, the dispositive question is not whether Luisa and the girls initially agreed to go to Carrion's house, but rather whether they later were detained or confined there against their will. Similarly, that Carrion did not physically restrain or threaten his hostages

---

**3.** Indeed, even the cases cited by Carrion in his brief make clear that a person need not be physically restrained in order to have been seized or detained. For instance, in *United States v. Macklin*, 671 F.2d 60 (2d Cir.1982), the Second Circuit stated that "[t]he very nature of

the crime of kidnapping requires that the kidnapper use some means of force—actual or threatened, physical *or mental*—in each elemental state of the crime, so that the victim is taken, held and transported against his or her will." *Id.* at 64 (emphasis added).

does not mean that he did not seize or detain them within the meaning of the Hostage Taking Act. Finally, it was up to the jury to decide whether Luisa and the girls were in fact free to leave Carrion's house. In light of the evidence before it—that Carrion knew that Luisa and the girls had no resources or abilities which would allow them to leave, and that he threatened them with the possibility of arrest and deportation—the jury was entitled to conclude that Carrion did not need to use any physical force to restrain Luisa and the girls; he was able to frighten and deceive them sufficiently to cause them to remain at his house. Accordingly, the Court finds that the evidence was sufficient to support Carrion's convictions for hostage taking.

## B. *Carrion's Sentence*

The district court sentenced Carrion to a term of imprisonment of 168 months on each of the twelve counts on which he was convicted, each term to run concurrently with the others. Carrion objects to this sentence, arguing that the district court erred because for nine of the counts on which he was convicted—the nine counts involving illegal aliens—the statutory maximum sentence is only five years' incarceration, or 60 months. Carrion's argument is well taken; his convictions on the nine counts involving illegal aliens carry maximum penalties of five years. *See* 8 U.S.C. § 1324(a)(1)(A), (B), (C). Because the district court may not impose any sentence greater than the maximum sentence specified in the statute under which a defendant is convicted, Carrion's sentences on each of those nine counts must be vacated, and the case remanded for resentencing.

The Government argues that Carrion's total term of 168 months is a permissible sentence under the federal sentencing guidelines' provisions for aggregating sentences. *See* U.S.S.G. §§ 3D1.4, 3D1.5. Whatever the merit of the Government's argument, the district court's judgment did not indicate that the district court was aggregating sentences; the district court stated only that the sentences imposed were to run concurrently. This Court expresses no opinion as to whether, on remand, it would be proper for the district court to aggregate sentences under sections 3D1.4 and 3D1.5.

## III. Conclusion

For the reasons stated, this Court affirms Carrion's convictions under the Hostage Taking Act, but vacates the sentence imposed by the district court and remands the case for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

## ON SUGGESTION FOR REHEARING EN BANC

Nov. 21, 1991.

PER CURIAM:

Defendant-appellant Ramiro Carrion–Caliz has suggested that this Court rehear his case en banc. Treating his suggestion as a petition for panel rehearing, the court determines that footnote 2 of the panel opinion must be deleted from the opinion. In all other respects, the petition for panel rehearing is DENIED.

Further, no member of the panel nor Judge in regular active service of this Court having requested that the Court be polled on rehearing en banc, *see* Fed. R.App.P. and Local Rule 35, the suggestion for rehearing en banc is DENIED.