# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 29, 2010

No. 07-40747

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JOSE A GARZA-ROBLES, also known as Jose Alberto Garza-Robles, also known as Betio, also known as Beto;
HECTOR HERRERA-SIFUENTES, also known as Checo

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before CLEMENT, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Two codefendants appeal from their convictions for kidnapping and conspiracy to kidnap. Both argue the evidence is insufficient to sustain their convictions, while one claims an error in sentencing. We AFFIRM.

## FACTS

Ramone Santiago Hernandez, Jr. was a drug trafficker living in Laredo, Texas. In June 2006, Hernandez was in the border city of Miguel Aleman, Mexico, which is joined with Roma, Texas by a bridge over the Rio Grande. He was attempting to set up a drug transaction. While there, Hernandez met one

of the defendants, Jose Garza-Robles.   The latter introduced Hernandez to Eulalio Suarez-Sifuentes, who was known as "Lalo."  Hernandez was aware that Lalo and Garza-Robles were members of a drug cartel known as the Gulf Cartel, and that Lalo was a high-ranking member.

Lalo and Hernandez developed a professional relationship – in a criminal sense.  Eventually, Lalo asked Hernandez to obtain new customers in the United States for his marijuana.  Hernandez arranged for the sale of about 650 pounds of marijuana to Samuel Gonzalez in Houston, Texas.  Hernandez was to be a middleman in the transaction, delivering Lalo's drugs to Gonzalez and Gonzalez's money to Lalo.  Prior to the delivery, Hernandez traveled to Houston and visited Gonzalez's house seven or eight times to determine whether Gonzalez could be trusted.  After Hernandez met Gonzalez but before the marijuana was delivered, Lalo told Garza-Robles to go to Houston so that he could assist Hernandez with the transaction and protect Lalo's interest.

The marijuana shipment arrived in Houston in late August 2006. Hernandez loaded it into a Chevrolet Yukon belonging to Gonzalez's cousin. Gonzalez was not home when Garza-Robles and Hernandez arrived at night with the drugs.  They parked the Yukon with its cargo in Gonzalez's garage, planning to return the next morning to collect $110,500 owed to Lalo.

The next day, the pair returned to Gonzalez's house and learned he had fled with his family, the Yukon, and the marijuana.  Garza-Robles and Hernandez unsuccessfully searched for Gonzalez that day.  In the afternoon, Garza-Robles finally called Lalo and explained what had occurred.  When Hernandez got on the telephone, Lalo told him that he wanted both men to come to Mexico and explain the situation in person.

Later that night, Lalo called and initially spoke to both men on a speaker phone.  At some point, Lalo told Garza-Robles to turn off the speaker phone, and the two spoke privately.  While on the phone with Lalo, Garza-Robles turned to

No. 07-40747

Hernandez and encouraged him to travel to Miguel Aleman, Mexico. Hernandez stated that he was scared to face Lalo. Garza-Robles said they would be in trouble and that he also was scared. They left for Mexico the next day. Lalo called several times while they were driving to ensure they were en route.

Along the way, Hernandez tried to arrange for police to arrest him so he would not have to face Lalo. Hernandez called the Texas state police from a rest area when Garza-Robles stopped to take a nap. He told the police officer that Garza-Robles had a small amount of drugs on him and gave the police the vehicle description and license plate number. Hernandez's attempts to be apprehended before entering Mexico were unsuccessful.

Prior to crossing the border, the two men stopped in Laredo so Hernandez could take a shower and change his clothes. At that time, Hernandez called his father who advised him to meet with Lalo to show good faith and to convince him of what happened. While in Laredo, Hernandez again told Garza-Robles that he did not want to see Lalo. Garza-Robles responded that they needed to explain the situation together.

On September 1, the two arrived at Lalo's estate in Miguel Aleman, Mexico, which was called Casa Amarilla. Between 10 and 15 heavily-armed men were present when Hernandez and Garza-Robles arrived. Among them was Lalo's cousin, the defendant Hector Herrera-Sifuentes. Lalo arrived a half-hour later armed with a machine gun and hand grenades. Lalo initially appeared friendly as Hernandez explained what happened. Lalo then told Hernandez he would have to pay $110,500 for the lost drugs, and that Hernandez could not leave until he paid. At Lalo's signal, the gates to Casa Amarilla shut. Lalo threatened Hernandez that his family would be killed if he left. He also instructed the guards to shoot Hernandez if he tried to escape.

During his 16-day detention, Hernandez was under constant guard. He was threatened and brutalized. The defendants Garza-Robles and Herrera-

No. 07-40747

Sifuentes guarded Hernandez at various times during his detention. Both were present when Hernandez was blindfolded, hit in the face with a gun, kicked in the ribs, and threatened with death while someone made the sign of a cross on him with a gun. Because he was blindfolded, Hernandez did not know which guards were beating him. Among other forms of abuse, he was punched and kicked, beaten with two-by-fours across his bare buttocks, sliced behind the ear with razors, wrapped in plastic wrap and beaten, had a gun shoved in his mouth, and had guns fired very close to his ears.

While detained, Hernandez was permitted to use his cell phone to arrange payments to Lalo. Hernandez's father collected $57,500 of Hernandez's money but understandably refused to take it to Mexico. On September 2, Lalo sent Garza-Robles to get the money from Hernandez's father in Roma, Texas. The payment was collected without incident. Hernandez also arranged for his girlfriend in Texas to make another payment on September 16. Lalo sent another of his operatives, Licensiado, to meet Hernandez's girlfriend in Roma and escort her and the money to Miguel Aleman.

At some point between the two payments, Hernandez's family notified the FBI that he was being held for ransom in Mexico. Prior to their entering Mexico, the FBI detained Hernandez's girlfriend and Licensiado. The FBI had Licensiado call Lalo to tell him they were detained and that the FBI knew Lalo was holding Hernandez. After first pretending to be confused, Lalo eventually permitted Hernandez to walk across the international bridge from Miguel Aleman to Roma.

Lalo instructed Hernandez to tell the FBI that he had not been kidnapped and warned Hernandez that Lalo would come after him if he did not return to Miguel Aleman with the rest of the money. Hernandez agreed to follow Lalo's instructions and return with the money. FBI agents met Hernandez halfway

4

No. 07-40747

across the bridge, searched him for weapons, and brought him to Laredo for debriefing. Hernandez agreed to cooperate with the FBI.

At the FBI's direction, Hernandez told Lalo over the telephone he would return to pay the remainder of the debt. Lalo explained that he was in trouble with his drug cartel superiors. They thought Hernandez had paid Lalo $200,000 for the missing marijuana. His superiors also were upset that Lalo did not seek permission for the kidnapping. Lalo told Hernandez to return to Miguel Aleman and explain that he had not been kidnapped and that he only had paid $57,500. Lalo informed Hernandez he would send Herrera-Sifuentes to Laredo and bring Hernandez back to Miguel Aleman. Herrera-Sifuentes and Garza-Robles traveled to Laredo to pick up Hernandez. As the meeting was about to start, the FBI moved in and arrested the defendants.

Both defendants were charged with kidnapping and conspiring to kidnap Hernandez in foreign commerce from the United States to Mexico. *See* 18 U.S.C. § 1201. Garza-Robles also was charged with receipt of ransom money. *See id.* § 1202. They were jointly tried and convicted on all counts. They received life sentences for the kidnapping and conspiracy convictions. Garza-Robles received an additional 120-month sentence to run concurrently with his life sentence for the receipt of ransom money conviction. Both filed timely notices of appeal.

DISCUSSION

A.   Sufficiency of the Evidence

Garza-Robles and Herrera-Sifuentes challenge the sufficiency of the evidence supporting their convictions for kidnapping and conspiracy.

Where defendants have preserved a challenge to the sufficiency of the evidence, as Garza-Robles and Herrera-Sifuentes have, we review the denial of a judgment of acquittal *de novo. United States v. Burns*, 162 F.3d 840, 847 (5th Cir. 1998) (citation omitted). We determine whether, when viewing the evidence in the light most favorable to the verdict, "a rational trier of fact could have

No. 07-40747

found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Ferguson*, 211 F.3d 878, 882 (5th Cir. 2000).

### 1. *Kidnapping*

The elements under this kidnapping statute are: "(1) the transportation in interstate [or foreign] commerce (2) of an unconsenting person who is (3) held for ransom or reward or otherwise, (4) such acts being done knowingly and willfully." *United States v. Barton*, 257 F.3d 433, 439 (5th Cir. 2001) (citation omitted); *see* 18 U.S.C. § 1201(a)(1). There must be proof that the victim was unlawfully seized, confined, inveigled, kidnapped, abducted, or carried away. 18 U.S.C. § 1201(a). Lack of consent is the only element in dispute.

The Government had to show Hernandez was transported in foreign commerce after he was seized or confined involuntarily in some manner. *See United States v. McRary*, 665 F.2d 674, 678 (5th Cir. 1982). "[N]on-physical restraint – for instance, fear or deception – can be sufficient to restrain a person against [his] will." *United States v. Carrion-Caliz*, 944 F.2d 220, 225 (5th Cir. 1991). The Government presented two theories on this question. One was that Hernandez was inveigled into accompanying Garza-Robles into Mexico. The other was that Hernandez went to Mexico only out of fear for his own and his family's safety. The Government urged both theories in its closing argument:

> There were two things going on there. One was [Hernandez's] fear. He had to go. Trying to think of any way he could be stopped from going . . . .
>
> The other thing [that] was operating was Lalo's, on his face, the words that he was saying, "Come on over here and we'll talk about it, and you tell us what is going on."

Jurors were given an instruction that Hernandez would have crossed the international border involuntarily if he was either seized or inveigled. The general verdict jurors reached did not reveal which theory was accepted. If the

6

evidence was sufficient to support one theory, the fact that the evidence was insufficient to support another of the theories does not negate the verdict. *Griffin v. United States*, 502 U.S. 46, 59-60 (1991); *United States v. Edwards*, 303 F.3d 606, 641 (5th Cir. 2002). We examine each theory.

We first look at the evidence that Hernandez was inveigled into Mexico. The word "inveigle," a jury instruction stated, "means to lure, or entice, or lead the person astray by false representations or promises, or other deceitful means." The Government argued that Hernandez was inveigled into accompanying Garza-Robles to Mexico under the false belief that he simply was going to explain to Lalo in person what happened to the lost load of drugs.

The evidence does not support the Government's theory. The jurors could not reasonably find that Hernandez was oblivious to the risks awaiting him in Mexico. Though he testified he was unaware he would be detained and brutalized, meaning he did not know the exact form his troubles might assume, he knew that he and his family were at significant risk. After Garza-Robles told Lalo of the lost drugs, Garza-Robles turned to Hernandez and said, "We're going to be in trouble, you know." Hernandez repeatedly told Garza-Robles he was scared and did not want to go to Miguel Aleman. Hernandez testified that he knew more or less what to expect by going to Mexico. He hoped, though, that meeting Lalo in person might give him "a chance," apparently meaning a chance to live. He admitted he knew he would be held accountable for the value of the lost drugs.

Acting FBI Supervisor Arturo Fuentes testified that the Gulf Cartel frequently committed drug-related kidnappings. Fuentes testified that "if you lose a drug load, if you are working for the Gulf Cartel, they expect you to pay that money back. And if you don't pay it back, your family members or you will be kidnapped until you pay that money back." He stated the propensity to kidnap sets the Gulf Cartel apart from other Mexican drug cartels. Hernandez

was aware he was working for the Gulf Cartel, and as we have indicated, he knew he faced substantial risks whether or not he went to Mexico to face Lalo.

There was evidence that Lalo sought to deceive Hernandez, but there was insufficient evidence that the deception was successful and that Hernandez voluntarily journeyed to Mexico. If the evidence had supported that deception caused Hernandez to cross the border, we would then need to address the impact of our precedents that conclude this kidnapping offense does not occur by the "entirely voluntary act of a victim in crossing a state line even though it is induced by deception." *United States v. McInnis,* 601 F.2d 1319, 1327 (5th Cir. 1979); *see also McRary*, 665 F.2d at 677. The Government argues this rule is limited to situations in which the victim took himself across a state line. Because of our holding that there was insufficient evidence to support the inveiglement theory, the legal issues are moot.

Before deciding to defer issues that arise under *McInnis* and *McRary*, we considered that the Supreme Court has distinguished between a general verdict that might be based on a *factually* unsupported theory and one possibly based on a *legally* inadequate theory. *Griffin*, 502 U.S. at 59. Because jurors "are well equipped to analyze the evidence" and reject factually unsupported grounds – indeed, such is a key role for jurors – a verdict of guilt should be sustained as presumably not being based on a ground for which there was insufficient proof. *Id.* (emphasis omitted). Conversely, jurors would not have reason to consider whether a theory was legally flawed; consequently, their own good judgment would not have saved them from an error about the law. *Id.* We have held, though, that a general verdict is sustainable when the theory that was factually unsupported was also legally unavailable. *United States v. Wilson*, 116 F.3d 1066, 1080 (5th Cir. 1997), *rev'd on other grounds*, *United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998) (en banc). We conclude that jurors in the present case would have rejected the unsupported theory due to insufficient

No. 07-40747

evidence, a rejection in no way made more or less likely because of the legal inadequacy that may also exist.

We now examine the sufficiency of the evidence to support the other theory. It was not necessary that Hernandez be "physically restrained or confined," as non-physical restraint arising from fear is enough to support a kidnapping conviction. *Carrion-Caliz*, 944 F.2d at 225. Being restrained against one's will is the key. *Id.* A person's will can be overcome physically or by mental inducements such as threats. *Chatwin v. United States*, 326 U.S. 455, 460 (1946). Hernandez's being sufficiently frightened to travel to Mexico against his will supports a jury finding that he was seized or confined. A jury instruction explained that to kidnap meant to "hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with detention" were part of the offense.

From the beginning, Hernandez told Garza-Robles he was scared to accompany him to Mexico. Hernandez insisted that Garza-Robles drive to Mexico because Hernandez was too nervous to drive. Hernandez testified that he had no choice but to meet Lalo in person because "if you don't show your face, they're going to come and kill your family. That's the way they work." On the way to Mexico, Hernandez called the Texas state police in an attempt to be arrested. Hernandez testified he told a police officer that he "was being kind of forced [to] go[] to Mexico, that [he] didn't want to go because [he] was scared [he] was not going to come back." The attempt to be apprehended was unsuccessful. When questioned why he did not just get out of the truck and run, Hernandez responded, "I was scared."

Prior to crossing the border, the pair stopped in Laredo, and Hernandez again told Garza-Robles he did not want to go see Lalo. Garza-Robles insisted that Hernandez had to explain in person what happened with the lost drugs.

9

When Garza-Robles and Hernandez reached the border, Hernandez did not inform the border patrol agent of his predicament. Hernandez explained, "You know, I wanted to get out . . . at that time; I mean, I didn't want to cross to Miguel Aleman, but I was just scared about everything, that they were going to come and get my family."

Rational jurors could conclude that Hernandez's travel to Mexico was not voluntary. They could reasonably find that Hernandez, seized by fear of what could happen to him and his family, traveled to Mexico against his will. Accordingly, the evidence was sufficient to support Garza-Robles' and Herrera-Sifuentes' convictions for kidnapping.

### 2.   *Conspiracy to Kidnap*

Garza-Robles challenges his conviction for conspiracy to commit kidnapping. He contends that even if there were a conspiracy to kidnap Hernandez, there is no evidence he was aware of it when he transported Hernandez in foreign commerce.

To prove conspiracy to commit kidnapping, the Government must establish: (1) the existence of an agreement between two or more people to pursue the offense of kidnapping; (2) the defendant knew of the agreement; and (3) the defendant voluntarily participated in the conspiracy. *See United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir. 2000) (citation omitted); 18 U.S.C. § 1201(c). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Mitchell*, 484 F.3d 762, 768-69 (5th Cir. 2007) (citation omitted).

The record contains sufficient evidence from which the jury could infer Garza-Robles was aware of and acted in accordance with a plan to kidnap Hernandez. We highlight some of that evidence, though we have also discussed it earlier. Lalo wanted Garza-Robles to go to Houston and assist Hernandez with the drug transaction and protect Lalo's interest. After the drug load was

lost, Garza-Robles telephoned Lalo and informed him of what happened. According to Hernandez, Lalo spoke with Garza-Robles privately for an extended period of time. Garza-Robles then handed the telephone to Hernandez. Lalo told Hernandez that he and Garza-Robles needed to come to Miguel Aleman and explain the situation in person. Lalo called back later that evening. Garza-Robles initially had Lalo on speaker phone, but Lalo requested he turn off the speaker phone. During the private conversation, Garza-Robles turned to Hernandez and said, "You know what, let's go. Let's go."

Lalo repeatedly called Garza-Robles as the pair traveled to Mexico. When Hernandez expressed his concern of facing Lalo, Garza-Robles insisted he had to go with him to Mexico. After arriving at Casa Amarilla, Lalo informed Hernandez he would be confined there until he paid for the lost load. Hernandez testified that Garza-Robles was one of the guards who watched him and was present during many of his beatings. Garza-Robles also went to Texas to pick up ransom money from Hernandez's father. In addition, FBI Supervisor Fuentes testified to the Gulf Cartel's propensity to commit kidnappings. Garza-Robles did not dispute he was a member of the Gulf Cartel.

Herrera-Sifuentes has not briefed a challenge to his conspiracy conviction on appeal. We simply note that because Herrera-Sifuentes admitted that he guarded Hernandez at Casa Amarilla, there is sufficient evidence he entered the kidnapping conspiracy at least by the time Hernandez was in Mexico. Joining a conspiracy after a victim has been transported in foreign commerce creates criminal responsibility for the prior acts. *See United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir. 1992).

There is sufficient evidence from which a rational jury could conclude that Garza-Robles and Herrera-Sifuentes knew of the conspiracy and were acting in furtherance of that conspiracy when Garza-Robles transported Hernandez in foreign commerce and when they both guarded Hernandez in Mexico.

11

B.    Sentence Enhancement

Garza-Robles argues that the district court erred in imposing a two-level enhancement for inflicting serious bodily injury upon Hernandez. Garza-Robles claims that although Hernandez was treated inhumanely and in a manner that shocks the conscience, he did not sustain "serious bodily injuries" as this term is defined in the Sentencing Guidelines.

This court reviews a district court's factual findings in sentencing for clear error. *United States v. Jimenez*, 323 F.3d 320, 322 (5th Cir. 2003). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* at 322-23.

A defendant convicted of kidnapping can receive a two-level enhancement "if the victim sustained serious bodily injury" while detained. U.S. Sentencing Guidelines Manual § 2A4.1(b)(2)(B). The Guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S. Sentencing Guidelines Manual § 1B1.1 app. n.1(L). Even if the defendant did not inflict the serious bodily injury, he can still be assessed the enhancement as long as he knew such injuries were being inflicted. *See United States v. Davis*, 19 F.3d 166, 171 (5th Cir. 1994).

The presentence report indicates that Hernandez had been assaulted repeatedly resulting in a broken rib, bruised buttocks, and cuts behind the ears. It was plausible for the district court to conclude these injuries involved "extreme pain" and therefore qualified as serious bodily injuries.

Based on these injuries, the district court's finding that Hernandez suffered serious bodily injury is "plausible in light of the record as a whole." *Jimenez*, 323 F.3d at 323.

AFFIRMED.